

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of )
)
K.T.H.-A., DOB: 06/07/2009, )
a minor child. )
)
TYWAN HILLIS, )
)
          Appellant, )
)
          v. )
)
STATE OF WASHINGTON, )
DEPARTMENT OF SOCIAL AND )
HEALTH SERVICES, )
)
          Respondent. )
)
_____ )

DIVISION ONE

No. 68953-3-I

UNPUBLISHED OPINION

FILED: April 29, 2013

DWYER, J. — Tywan Hillis appeals from the trial court's order terminating

his parental rights to his daughter, K.T.H.-A. Hillis asserts that the order

terminating his parent-child relationship with K.T.H.-A. must be reversed because

the Department of Social and Health Services (the Department) did not prove

that (1) there was little likelihood that Hillis's parental deficiencies could be

remedied so that K.T.H.-A. could be returned to him in the near future, (2) Hillis

was presently unfit to parent his daughter, (3) continuation of the parent-child

relationship would clearly diminish K.T.H.-A.'s prospects for integration into a

stable and permanent home, and (4) termination of Hillis's parental rights was in

K.T.H.-A.'s best interests. However, substantial evidence supports the trial

court's findings on each of these questions, all of which were decided adversely to Hillis. Accordingly, we affirm the trial court's order.

I

K.T.H.-A. was born on June 7, 2009 to Azalea Adams and Tywan Hillis. Adams has two other daughters, K.T.H.-A.'s half-sisters, who were not fathered by Hillis. On August 6, 2009, the Bellevue Police Department placed K.T.H.-A. and her two half-sisters—who, at the time, were eleven and three years old—in protective custody after they had been left alone in Adams's apartment for several days without adult supervision. Adams had last been seen by a neighbor on July 16, 2009. Although Hillis was not living with Adams at the time, he had been to the apartment several times to check on K.T.H.-A. and her half-sisters. He did not stay with the children or arrange adult care for them. However, Hillis reported his concerns to his mental health clinician, Ami Ingram, who thereafter made a referral to Child Protective Services.

On August 6, 2009, K.T.H.-A. was removed from her parents' custody pursuant to a finding of dependency. As a result of K.T.H.-A.'s abandonment, Hillis subsequently pled guilty to two counts of child abandonment of a dependent person in the third degree. In addition, the criminal court ordered that there be no contact between Hillis and K.T.H.-A., except as permitted by the dependency court.

Adams's whereabouts were unknown until she was arrested for delivery of cocaine on October 20, 2009. She appeared for the first time in the dependency action on October 30, 2009. Adams admitted that she had a cocaine addiction

- 2 -

and that she had relapsed. On December 4, 2009, K.T.H.-A. was declared dependant as to Adams.

On February 11, 2010, the trial court entered an agreed dependency order and partial dispositional order as to Hillis. On April 1, 2010, the court entered a dispositional order as to Hillis, which set forth the services in which Hillis was required to participate in order to correct his parental deficiencies. Hillis was ordered to (1) complete a psychological evaluation and follow through with any recommended treatment, (2) complete a parenting assessment and follow through with any recommended treatment, (3) continue with individual mental health counseling, (4) perform several urinalyses, and (5) in the event that K.T.H.-A. were to be placed in Hillis's care, participate in family preservation services and work with a public health nurse.

Hillis had been voluntarily involved in mental health counseling through Therapeutic Health Services (THS) since 2009. Ingram was his primary mental health provider at THS. Initially, Hillis sought to learn how to reintegrate himself into the community after having been incarcerated for several years.[1] Hillis also had concerns about his feelings of agitation, irritability, frustration, and confusion. He reported that he had a history of anger and violence and that he was at times unable to control his impulses.

In June 2011, Dr. Joanne Solchany completed a "psychiatric & relationship evaluation" of Hillis. During the evaluation, Dr. Solchany noted that

---

[1] Hillis was 17 years old when he was convicted of murder in the second degree, for which he served a lengthy prison term. In addition to his murder conviction, Hillis's more recent criminal history includes intimidating a public servant in 2005 and forgery in 2007.

Hillis did not know what month it was. She also observed that his thinking was very tangential and hyper-detailed, and that he experienced symptoms such as loose associations, difficulty focusing, drifting off, and disassociation. She diagnosed him with Axis 1: schizoaffective disorder, posttraumatic stress disorder, and Axis II: cluster B personality disorder features. Dr. Solchany's treatment recommendation included that Hillis continue with mental health treatment, be reassessed for medication, and be prescribed psychotic medication. Following this evaluation, Hillis continued to see Ingram at THS for medication management. However, Hillis frequently missed his scheduled appointments. He also failed to consistently take mental health medications prescribed to him as part of his treatment.

Dr. Solchany's treatment recommendation also called for Hillis to remain clean and sober. Accordingly, Hillis participated in and completed drug and alcohol treatment at THS. However, while in treatment, he committed the offenses of driving with an open container and driving with a suspended license. A police officer had discovered bottles of beer and individual bags of marijuana inside a passenger's jacket in the vehicle Hillis was driving. Three of the passengers in the vehicle were under 21 years old. Hillis possessed a medical marijuana card and claimed that the marijuana belonged to him, despite his testimony at the termination hearing that he had not used marijuana since approximately February 2010.

During the course of the dependency, in addition to completing the drug and alcohol treatment program, Hillis also completed the urinalyses. However,

Hillis did not complete two parent coaching services that were offered to him. Hillis was frequently tardy to his appointments for one of these services, and, consequently, he would miss the entire appointments on those days. As a result, his participation in this service was deemed unsuccessful. Moreover, Hillis's participation in the other parent coaching service was unsuccessful because a disagreement arose between the provider and Hillis at the first session. Although the provider was available for coaching after this disagreement occurred, Hillis did not continue the service or seek another provider.

On July 7, 2011, Hillis reported to a therapist at THS that he had been involved in a physical altercation in which he grabbed a man by his throat and threw bricks at him. He also reported two months later that he had aggressive and violent impulses towards people. Additionally, Hillis had domestic violence issues in prior relationships.[2] Because of this history, the Department and the Court Appointed Special Advocate (CASA) referred him to a domestic violence batterer's treatment service. Although this service was not ordered by the dependency court, Hillis did not engage in the treatment.

During the dependency, K.T.H.-A. and her older half-sister were placed together in foster care. According to a Foster Care Assessment Program (FCAP)

---

[2] Following his release from prison for his murder conviction, Hillis married a woman and fathered two children. However, in September 2010, a parenting plan was put in place, restricting Hillis's contact with these children. The superior court ordered this restriction in part because of Hillis's history of domestic violence. Hillis was not permitted to visit with the children unless he successfully completed 52 weeks of a state-certified domestic violence batterer's treatment program. Hillis testified that he had not completed the program.

assessment report, the foster parents expressed an interest in adopting K.T.H.-A. and her half-sister.

Hillis visited with K.T.H.-A. twice a week for two hours throughout the course of the dependency. These visits were initially supervised; however, they changed to monitored visits and remained monitored throughout the dependency. The social worker, the CASA, the visit supervisors, and the FCAP evaluator reported many positive interactions between Hillis and K.T.H.-A. when they observed these visits.

On March 22, 2011, the Department filed a petition in King County Superior Court seeking termination of the parent-child relationships between Adams and Hillis and K.T.H.-A. Adams relinquished her parental rights prior to the termination hearing. At the time of the termination hearing, K.T.H.-A. was almost three years old, and had been removed from her mother's care for almost 32 months. She had never been primarily cared for by Hillis.

The termination hearing took place over five days, from March 28, 2012 to April 4, 2012. Several witnesses testified, including Hillis, social workers Kristina Augustavo and Krysten Legette, visit supervisors, the CASA, Dr. Solchany, Ingram, and the FCAP evaluator.

Ingram testified that Hillis had made progress in impulse control, goal direction, and maintaining himself better in extended counseling sessions. However, the trial court made an uncontested finding that Ingram's testimony was not credible. The court also made an uncontested finding that there was conflicting testimony as to whether Hillis actually had improved and that little

evidence indicated that Hillis's mental health had progressed since Dr. Solchany's evaluation in June 2011.

Moreover, Hillis testified that he did not believe that he needed to take the medicine prescribed to stabilize his moods. His social worker, Augustavo, testified that Hillis had informed her that he had not been taking the medication and that he was not willing to do so because he found it unnecessary. Hillis also stated numerous times that he only took his medication because it was court-ordered. The trial court made an uncontested finding that Hillis refused to comply with the mental health medications as recommended by his treatment providers.

Hillis testified that he lived with Nicole Ward in a house that she was renting. Hillis's name was not on the lease. Ward is Hillis's childhood friend with whom he began an intimate relationship once his previous marriage ended. Hillis and Ward have one child together, who was born in August 2010. Hillis expressed at the termination hearing and elsewhere that he was interested in moving out of the house and living on his own. He testified that Ward was not his girlfriend and that he sometimes spent the night at other places. The trial court made an uncontested finding that Hillis did not show commitment to a stable living environment and that lack of stable housing was detrimental to K.T.H.-A. and her needs. The trial court also found that continuing the parent-child relationship between K.T.H.-A. and Hillis would become increasingly confusing and damaging for K.T.H.-A.'s sense of belonging and family. This finding is uncontested.

On June 1, 2012, the trial court granted the Department's petition to terminate Hillis's parental rights. In addition to the uncontested findings discussed previously, the trial court made the following contested findings:

> 2.32 There is little likelihood that conditions will be remedied so that [K.T.H.-A.] can be returned to her father within the near future. There is no evidence or argument that any other additional services should be offered, but rather that Mr. Hillis should have more time because of consistent visits and some progress in some areas . . .
>
> 2.44 Continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home . . .
>
> 2.45 Termination of Mr. Hillis' parental rights to [K.T.H.-A.] is in [K.T.H.-A.'s] best interests . . .
>
> 2.47 Tywan Hillis is currently unfit to parent [K.T.H.-A.] . . .

Hillis appeals.

II

Hillis contends that the trial court erroneously made the factual findings that (1) there was little likelihood that his parental deficiencies would be remedied so as to allow K.T.H.-A. to be placed in his care in the near future, (2) Hillis was currently unfit to parent K.T.H.-A., (3) the continuation of the parent-child relationship would clearly diminish K.T.H.-A.'s prospects for early integration into a stable and permanent home, and (4) termination of Hillis's parental rights was in K.T.H.-A.'s best interests. Because substantial evidence supports each of these findings, we disagree.[3]

_____

[3] Hillis assigns error to several of the trial court's findings of fact. However, he fails to support some of those assignments of error with citation to the record and legal authority. We do

"Parents have a fundamental right to the care and custody of their children, and a trial court asked to interfere with that right should employ great care." In re Welfare of M.R.H., 145 Wn. App. 10, 23, 188 P.3d 510 (2008). "[T]ermination of parental rights should be allowed 'only for the most powerful [of] reasons.'" In re Welfare of S.J., 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (second alteration in original) (internal quotation marks omitted) (quoting In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

To terminate parental rights, the Department must satisfy a two-step test. RCW 13.34.180(1),.190; In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step requires the Department to prove, by clear, cogent, and convincing evidence, the six termination factors enumerated in RCW 13.34.180(1).[4] In re Dependency of K.N.J., 171 Wn.2d 568, 576-78, 257 P.3d 522 (2011). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.'" In re Dependency

---

not consider unsupported assignments of error. RAP 10.3(a)(5); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[4] The six termination factors are:

    (a) That the child has been found to be a dependent child;

    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . .

    (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). The second step focuses on the child's best interests and is reached only if the first step is satisfied. A.B., 168 Wn.2d at 911.

Where the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. Where, as here, the proof required is clear and convincing, "the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test." P.D., 58 Wn. App. at 25. Moreover, we defer to the trial court's credibility determinations on appeal from an order terminating parental rights. T.B., 150 Wn. App. at 607.

Hillis first asserts that the Department failed to prove that there was little likelihood that his parental deficiencies would be remedied so as to allow K.T.H.-A. to be placed in his care in the near future. RCW 13.34.180(1)(e). This is so, Hillis contends, because at the time of the termination trial, he had made significant progress in addressing his mental health issues. However, the record does not support this contention. Rather, substantial evidence supports the trial

- 10 -

court's determination that Hillis's parental deficiencies would not be remedied in the near future.

The focus of RCW 13.34.180(1)(e) is on whether a parent has corrected his or her parental deficiencies. In re Dependency of T.R., 108 Wn. App. 149, 165, 29 P.3d 1275 (2001). "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005). "A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency." M.R.H., 145 Wn. App. at 28.

Hillis's parental deficiencies included his unaddressed mental health issues, his lack of stability, and his inadequate parenting skills. With regard to Hillis's mental health, testimony presented at the hearing evinced that Hillis failed to attend to his mental health issues by missing several of his medication appointments with Ingram and by refusing to consistently take the mental health medications prescribed to him. His social worker, Augustavo, testified that Hillis's failure to address his mental health issues by complying with treatment recommendations indicated that he would not be able to meet K.T.H.-A.'s needs.

Moreover, evidence presented at the hearing revealed that although Hillis had participated in mental health counseling for several years, he had not made sufficient progress in that time. Dr. Solchany testified that despite Hillis's two years of therapy with Ingram, Hillis continued to exhibit psychotic-like symptoms. She opined that at the time of the termination hearing, Hillis still required regular

monitoring to address these symptoms. Furthermore, the trial court made an uncontested finding that Hillis's mental health had not improved since June 2011 when he was evaluated by Dr. Solchany.

In addition to failing to comply with his medical treatment, Hillis also did not satisfy all of the court-ordered services required of him to correct his parental deficiencies. He was unsuccessful in completing the two parent coaching services that were offered to him. Further, the testimony from the CASA, Dr. Solchany, and the social workers indicated that Hillis's parenting skills were inadequate, and, at the time of the termination trial, he had not made sufficient progress in achieving these skills. Such skills included noticing and responding to non-vocal cues, organizing and achieving naps, meals, health and dental care, activities, peer relationships, and school. Augustavo testified that she was concerned that Hillis could not provide K.T.H.-A. with age-appropriate parenting.

Moreover, testimony adduced at the termination hearing indicated that it was imperative that K.T.H.-A. obtain stability and permanency as soon as possible, and that Hillis would not succeed in correcting his deficiencies in this limited time. The CASA testified that to become a safe full-time parent, Hillis would need a permanent residence where he stayed every day, positive mental health reports for at least a year, and to take parenting classes. She believed that it would take at least one year to meet these requirements. The CASA believed that it would not be in K.T.H.-A.'s best interests to wait for Hillis to acquire the skills necessary to become a full-time parent. Moreover, Dr.

Solchany testified that addressing personality disorders through therapy can be a lengthy process that usually lasts several years.

The testimony established that Hillis failed to make significant progress in improving his mental health condition or acquiring the necessary skills to parent K.T.H.-A. Nor could he do so in the requisite near future, as determined by K.T.H.-A.'s imminent need for permanency and stability. Accordingly, the trial court's finding was supported by substantial evidence.

Hillis next contends that the trial court erroneously found that Hillis was presently unfit to parent K.T.H.-A. A finding of a parent's current fitness is required by constitutional due process concerns. A.B., 168 Wn.2d at 920. Contrary to Hillis's contention, substantial evidence in the record supports the trial court's finding.

First, Hillis was unfit at the time of the hearing because he was not consistently making efforts to address and resolve his mental health diagnoses. As discussed previously, it is undisputed that Hillis made insufficient progress in addressing his mental health issues. Hillis missed several appointments with his THS mental health clinician. He also made numerous statements indicating that he was not taking his prescribed medication, that he did not believe he needed to take the medication, and that he only took the medication because he was ordered to do so by the court. According to Dr. Solchany, Hillis's continued mental health problems and instability would have a detrimental impact on K.T.H.-A.'s development.

Second, Hillis was found unfit at the time of the hearing because his housing situation was not considered to be adequately stable to parent K.T.H.-A. Although Hillis initially appeared to have established a stable living situation with Ward, he repeatedly stated that he desired to move out of Ward's home in order to live on his own, and that he had spent some nights at relatives' homes. Dr. Solchany expressed concern about Hillis's ability to parent K.T.H.-A. successfully without another adult in the house who was stable and could monitor his mental health. Hillis's social worker, Legette, agreed that it would be a step backward for Hillis to move out and live on his own because he would not have the required support that Ward could provide in parenting K.T.H.-A. She stated that if Hillis were the primary caretaker of K.T.H.-A., she would have concerns about his ability to make necessary arrangements for K.T.H.-A., such as medical and school appointments. Legette's opinion was in part based upon Hillis's difficulty in managing his own mental health. Additionally, because Hillis was not regularly attending parenting skills classes, his progress in achieving such skills was deemed insufficient.

Finally, although he had been involved in mental health therapy for several years, Hillis continued to struggle with regulating his violent tendencies. Hillis made statements regarding his recent desire to hurt people. He also admitted to grabbing a person by his throat and throwing bricks at him. Dr. Solchany stated that this incident was indicative of Hillis's unresolved issues with anger and impulsivity, which posed a threat of violence. In addition, in September 2011, Hillis disclosed that he was experiencing mood swings and that he would strike

people when he became frustrated. Furthermore, the trial court made an uncontested finding that Hillis's recent open container citation demonstrated poor judgment and a lack of impulse control. The court noted that this occurred even though he was then involved in drug and alcohol treatment.

The testimony presented at the termination hearing provided ample evidence to establish that Hillis was not currently fit to parent K.T.H.-A. Accordingly, the trial court did not err in making this finding.

Hillis next asserts that the Department failed to prove that continuation of the parent-child relationship would clearly diminish K.T.H.-A.'s prospects for early integration into a stable and permanent home, as required by RCW 13.34.180(1)(f). Again, we disagree.

"[T]he main focus of [this statutory factor] is the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. The State does not have to prove that a stable and permanent home is available at the time of termination." In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999). "[T]his factor is mainly concerned with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources." In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004).

Here, the record supports the trial court's finding that continuation of Hillis's relationship with K.T.H.-A. would clearly diminish her prospects for early integration into a stable and permanent home. Termination of parental rights

would give K.T.H.-A. the opportunity to become part of a permanent home through adoption. Testimony adduced at trial established that K.T.H.-A. was adoptable and that she had prospects for adoption. However, if Hillis were to retain his parental rights, adoption would not be possible.

Dr. Solchany testified that if K.T.H.-A. continued visitation with her father instead of proceeding with adoption, K.T.H.-A. might lose the opportunity for stability, cohesiveness, and a sense of family. In addition, Legette averred that a failed placement in her father's care would cause K.T.H.-A. to forgo her chance of permanency with her foster family.

Accordingly, substantial evidence supports the trial court's finding that continuation of Hillis's relationship with his daughter would clearly diminish her prospects for early integration into a stable home.

Hillis finally asserts that the Department failed to prove that termination of his parental rights was in K.T.H.-A.'s best interests. He contends that termination of his parental rights is not in K.T.H.-A.'s best interests because he and K.T.H.-A. enjoy a strong connection with one another. The record demonstrates that Hillis and K.T.H.-A. did, in fact, share a bond with one another, as reflected in the reports of their visitations. However, substantial evidence supports the finding that termination of the parent-child relationship was in K.T.H.-A.'s best interests.

"[T]he goal of a dependency hearing is to determine the welfare of the child and his [or her] best interests." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Accordingly, to terminate parental rights, the trial court must find not only that the statutory elements set forth in RCW 13.34.180(1)

are met; additionally, the trial court must determine, by a preponderance of the evidence, that termination is in the best interests of the child. RCW 13.34.190(1)(b). See also S.J., 162 Wn. App. at 880; P.D., 58 Wn. App. at 25. "[T]he factors involved in determining the 'best interests' of a child are not capable of specification; rather, each case must be decided on its own facts and circumstances." In re Dependency of A.V.D., 62 Wn. App. 562, 572, 815 P.2d 277 (1991). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period.'" T.R., 108 Wn. App. at 167 (alteration in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Several witnesses testified that it would be in K.T.H.-A.'s best interests for Hillis's parental rights to be terminated. Social worker Legette testified that it was in K.T.H.-A.'s best interests because K.T.H.-A. required permanency and because of Hillis's parental deficiencies. In Legette's view, K.T.H.-A.'s need for stability and permanency was more important than continuing the existing parent-child relationship. She opined that K.T.H.-A. needed consistency, stability, and an environment free of violence. Legette felt that K.T.H.-A. would be at risk emotionally and physically if she were to be placed in Hillis's care. This determination was based on Hillis's inability to follow through with the ordered services—which indicated that he had difficulty taking care of himself—and that it is a greater challenge to take care of a child.

The CASA also testified that termination of parental rights would be in the best interests of K.T.H.-A. This was because of the fact that K.T.H.-A.—who was almost three years old at the time of the termination hearing—had been in dependency for almost all of her life, and her need for stability and permanent placement would not be met if termination were not ordered. She added that Hillis did not have sufficient time left to acquire the skills and do what was necessary to become a safe full-time parent. The CASA also believed that Hillis's living situation was not stable, in part because of his stated intention to move out of Ward's home. She also testified that Hillis's history of domestic violence and criminal charges reflected his unpredictability and that the threat of his future imprisonment could risk K.T.H.-A.'s stability.

The FCAP evaluator agreed that permanency needed to be established for K.T.H.-A. because too much time had passed for K.T.H.-A., as she had been out of her mother's care for 32 months at the time of the hearing. Dr. Solchany testified that she would have major concerns about Hillis's ability to parent K.T.H.-A. every day, as well as his ability to provide stability. She stated that K.T.H.-A. deserved to have the stability of a permanent family in which she would feel included. According to Dr. Solchany, if termination of parental rights were not granted, K.T.H.-A. would miss the opportunity to feel deeply rooted in a family, which would impact her negatively in her long-term development.

In addition, Augustavo averred that she did not believe Hillis could meet K.T.H.-A.'s needs due to his unaddressed mental health issues and his inconsistency in attending appointments. She also did not believe that Hillis

would be able to read his daughter's cues and respond appropriately. She expressed further concerns about whether Hillis would be able to provide an environment that was consistently free of violence or aggression.

Furthermore, at the time of the termination hearing, K.T.H.-A. and her half-sister were placed together in the care of foster parents who were interested in adopting them. The CASA opined that it would be in K.T.H.-A.'s best interests to be placed with her older half-sister—with whom she has lived consistently throughout her life—without the threat of instability or possible violence that could occur were K.T.H.-A. to be placed in her father's care. Dr. Solchany testified that the relationship with her half-sister was very important to K.T.H.-A.'s interests.

The trial court's finding that severing Hillis's parental rights was in K.T.H.-A.'s best interests is supported by substantial evidence. If the petition were not granted, K.T.H.-A. would face the prospect of being placed in foster care for an indefinite period of time while waiting for Hillis to improve his parenting skills, become more mentally stable, and establish a stable home. The testimony was that further delay was not in K.T.H.-A.'s best interests.

Affirmed.

We concur:

- 19 -