COURT OF APPEALS DIV
2013 JUL 29 AM 10: 28


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of ) | DIVISION ONE |
| ) | |
| F.K.O., DOB: 04/22/2005, ) | No. 69750-1-I |
| a minor child. ) | |
| ) | |
| STATE OF WASHINGTON, ) | UNPUBLISHED OPINION |
| DEPARTMENT OF SOCIAL AND ) | |
| HEALTH SERVICES, ) | |
| ) | |
| Respondent, ) | |
| ) | |
| v. ) | |
| ) | |
| LINDSEY OLDHAM, ) | |
| ) | |
| Appellant. ) | FILED: July 29, 2013 |
| _____ ) | |

DWYER, J. — Lindsay Oldham appeals from the trial court's order terminating her parental rights to her son, F.K.O. Oldham asserts that the order must be reversed because the Department of Social and Health Services (the Department) did not prove that (1) all reasonably available, necessary services, capable of correcting her parental deficiencies within the foreseeable future, were offered or provided to her, (2) she failed to make substantial progress toward correcting her parental deficiency of mental illness, which affects her ability to parent, and (3) she was currently unfit to parent F.K.O. However, a sufficient quantum of evidence was admitted at trial in order to support each of these findings. Accordingly, we affirm the trial court's order.

I

On the evening of November 1, 2010, a police sergeant from the Snoqualmie Police Department found F.K.O., who was five years old at the time,[1] wandering inside a bowling alley without parental supervision. F.K.O. appeared scared and confused. The police sergeant recognized F.K.O. from approximately 40 previous police encounters involving F.K.O.'s mother, Oldham.[2]

The police sergeant subsequently discovered Oldham standing alone outside of the bowling alley. When he approached her, she informed him that she was "waiting for a train to come by." However, no train tracks were located in the vicinity and no train was due. The sergeant observed that Oldham's speech was disconnected and that she verbally rambled at length. As a result, he concluded that she was unable to care for F.K.O. and needed professional attention. Oldham agreed to see a mental health professional, and was subsequently admitted to a hospital for an evaluation. That night, F.K.O. was placed in protective custody.

The following day, Oldham was admitted to a mental health facility for further stabilization and treatment. There, she was diagnosed with psychotic disorder. However, upon discharge from the facility on November 5, 2010, Oldham refused to receive any referrals to treatment providers, assistance with mental health treatment, or medication.

---

[1] F.K.O. was born on April 22, 2005. The whereabouts of his alleged father—whose parental rights were terminated in July 2012—remain unknown.

[2] Since F.K.O.'s birth, Child Protective Services had received numerous referrals, including four from the Snoqualmie Police Department.

On March 22, 2011, the trial court entered an order of dependency and disposition as to Oldham. The disposition order set forth services in which she was required to participate in order to correct her parental deficiencies. Oldham was ordered to (1) complete a psychiatric evaluation for medication and follow treatment recommendations, (2) complete a psychological evaluation with a parenting component and follow all recommendations, (3) cooperate with the establishment of paternity, and (4) participate in family preservation and public health nurse services upon F.K.O.'s return home. Moreover, supervised visitation was ordered twice a week.

Throughout the dependency, the Department repeatedly advised Oldham of the services she was required to complete. Oldham acknowledged that her involvement in these services was essential to achieving reunification with F.K.O. Nevertheless, at a permanency planning hearing on October 31, 2011, the trial court found that Oldham had neither participated in the ordered services nor engaged in visitations with F.K.O. On January 3, 2012, the trial court ordered a temporary suspension of visitations until Oldham could demonstrate her compliance with mental health treatment. As of April 23, 2012, the trial court once again found that Oldham had failed to avail herself of any court-ordered services. The Department thereafter filed a petition on April 27, 2012, seeking termination of Oldham's parental rights.

On June 19, 2012, Oldham was involuntarily committed to Western State Hospital for a 14-day competency restoration. A psychiatric assessment was performed on Oldham in which she was diagnosed with psychosis, not otherwise

specified, and prescribed antipsychotic medication. Shortly after her release from Western State Hospital, Oldham was involuntarily committed to Harborview Medical Center, where she was diagnosed with schizoaffective disorder. At this time, she informed the Department's social worker, Timothy Earwood, that she wished to participate in court-ordered services. This was the first time that Oldham demonstrated to Earwood a willingness to engage in the recommended services.

On September 13, 2012, Sound Mental Health completed a "Psychological/Psychiatric evaluation" of Oldham. The clinician diagnosed her with schizoaffective disorder. She recommended against F.K.O.'s return to Oldham and suggested, instead, that F.K.O. "remain in foster care until [Oldham] has participated in mental health treatment for a longer period of time."

Following a permanency planning hearing on October 8, 2012, the trial court found that Oldham had been "compliant with what has been ordered but is awaiting further service recommendations." That same day, the court entered an order permitting the resumption of supervised visitations.

On October 5, 2012, Dr. Steve Tutty met with Oldham to conduct a "Psychological Evaluation and Comprehensive Parenting Evaluation." In addition to interviewing Oldham for purposes of the psychological evaluation, Dr. Tutty observed Oldham interact with F.K.O. At this point, F.K.O had not seen Oldham for approximately 18 months. He did not initially recognize her.

In the written evaluation, dated October 11, 2012, Dr. Tutty diagnosed Oldham with schizoaffective disorder, a condition "characterized by labile moods

(severely depressed and euphoric/agitated states) and psychosis (e.g., delusional beliefs, auditory/visual hallucinations, paranoia, etc.) that markedly impair perception and problem solving." Dr. Tutty determined that Oldham's disorder was chronic and severe, and likely to have contributed to her past abuse and neglect of F.K.O. He considered Oldham to be at a high risk for future decompensation episodes, despite her recent engagement in treatment. Dr. Tutty also opined in the evaluation that

> Oldham remains at high risk with respect to the welfare of [F.K.O.] by virtue of her psychiatric pathology and aforementioned parenting deficits. It is highly unlikely, in this examiner's opinion, that she would be able to remediate her deficits within the time frame allowed the Department for establishing permanency.

Accordingly, Dr. Tutty's evaluation recommended against Oldham's reunification with F.K.O. at the time of the evaluation or in the foreseeable future. He further recommended that Oldham undertake "extensive psychiatric treatment and parenting education to remediate [her] deficits." To stabilize her condition, the report suggested that Oldham engage in case management, individual counseling, and routine psychiatric visits over the course of the following 12 months.

The termination hearing took place on November 13 and 14, 2012. At this time, F.K.O. was seven years old and had been removed from Oldham's care for approximately two years. He had been placed with foster parents and had grown attached to them. The trial court made an uncontested finding that F.K.O. was adoptable and had prospects for adoption.

Several witnesses testified at the termination hearing, including Oldham, Earwood, the Court Appointed Special Advocate (CASA), and Dr. Tutty. According to Oldham's testimony, at the time of the hearing, she had been consistently taking antipsychotic medication for approximately five months. Moreover, she testified that she had been also receiving medication management and had been taking parenting classes at Sound Mental Health. Nevertheless, when asked if anything was necessary for her to do or complete in the event that F.K.O. were permitted to return to her care, Oldham replied, "[n]o."

In his testimony, Dr. Tutty described schizoaffective disorder as a chronic, lifelong condition involving the vacillation between depressive and psychotic states. He testified that the disorder tends to impair judgment, insight, and social, academic, and vocational functioning. According to Dr. Tutty, the prognosis is poor for those diagnosed with schizoaffective disorder. The condition can require years of support and treatment, including long-term counseling. Moreover, Dr. Tutty explained that schizoaffective disorder can adversely affect one's ability to parent.

Furthermore, Dr. Tutty averred that, before he could recommend reunification or a transition to reunification with F.K.O., Oldham would need to find the proper pharmacotherapy combination to stabilize her condition. Oldham would also require extensive mental health counseling and parenting training. In addition, in order for visits to ensue, Dr. Tutty recommended that Oldham's condition be stabilized for a period of six months, and that she display adequate parenting skills.

Earwood testified that a substantial amount of time had passed in which Oldham failed to engage in court-ordered services or visitations with F.K.O. He recommended against unsupervised visits because Oldham, at the time of the termination hearing, suffered from a major mental illness and had only recently begun treatment. Earwood additionally opined that, in order to achieve reunification with her son, Oldham would need to make progress in her treatment and attain mental stability for at least one year. Finally, Earwood explained that F.K.O.'s needs included an established routine, reliability, a caregiver whom he could trust, and an environment that was less inclined to cause him anxiety.

Diana Farrow, the CASA, testified that, because of his age and his acute awareness of the uncertainty surrounding his future placement, the "near future" for F.K.O. was within two months following the termination hearing. Thus, it was critical that F.K.O. be permanently placed in that time frame. Farrow also felt that it was in F.K.O.'s best interests that Oldham's parental rights be terminated.

The trial court granted the Department's petition to terminate Oldham's parental rights. In its findings, the court determined that there was little likelihood that conditions would be remedied such that F.K.O. could return to Oldham in the near future. This was so because, throughout the dependency, Oldham had been unwilling to participate in and successfully complete services offered to correct her parental deficiencies. The court additionally found that, after over two years of dependency, Oldham was just beginning to engage in mental health treatment. The trial court also determined that the near future for F.K.O. was 30 to 60 days, and that Oldham could not safely parent him in this time frame.

The trial court also made the following contested findings:[3]

2.11 The Department has established that all the services ordered by the court in the dispositional order have been expressly and understandably offered or provided to the parents. The Department has also established that all necessary services, reasonably available, and capable of correcting the parental deficiencies within the foreseeable future have been offered or provided to Ms. Oldham.

2.13 [Oldham] has not successfully engaged in services nor has she made substantial progress toward correcting her parental deficiency of mental illnesses, which affects her ability to parent.

2.22 [Oldham] is unfit to parent this child. Her testimony demonstrates that she is unaware of her role in [F.K.O] having been removed from her care and, perhaps understandably, her need to treat her mental health conditions.

Oldham appeals.

II

Oldham first contends that the trial court erroneously found that the Department had established that all necessary services, reasonably available and capable of correcting her parental deficiencies within the foreseeable future, were expressly and understandably offered or provided to her. Because a sufficient quantum of evidence was introduced in support of each of these findings, her claim fails.

---

[3] Oldham assigns error to the following findings of fact entered by the trial court: 2.11, 2.13, 2.14, 2.15, 2.16, 2.17, 2.19, 2.20, 2.22, 2.23, and 2.24. However, she fails to support most of these assignments of error with citation to the record and legal authority. We do not consider unsupported assignments of error. RAP 10.3; Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Furthermore, unchallenged findings of fact are treated as verities on appeal. Fuller v. Emp't Sec. Dep't, 52 Wn. App. 603, 605, 762 P.2d 367 (1988). Thus, on appeal, we treat only the following findings of fact as in dispute: 2.11, 2.13, and 2.22.

"Parents have a fundamental right to the care and custody of their children, and a trial court asked to interfere with that right should employ great care." In re Welfare of M.R.H., 145 Wn. App. 10, 23, 188 P.3d 510 (2008). "[T]ermination of parental rights should be allowed 'only for the most powerful [of] reasons.'" In re Welfare of S.J., 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (internal quotation marks omitted) (quoting In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

To terminate parental rights, the Department must satisfy a two-step test. RCW 13.34.180(1), 13.34.190; In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove, by clear, cogent, and convincing evidence, the six termination factors enumerated in RCW 13.34.180(1).[4] In re Dependency of K.N.J., 171 Wn.2d 568, 576-78, 257 P.3d 522 (2011). One such factor requires the Department to prove that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of

---

[4] The six termination factors are:
    (a) That the child has been found to be a dependent child;
    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
    (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.
RCW 13.34.180(1).

correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). These services "must be tailored to each individual's needs." In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). The second step focuses on the child's best interests and is reached only if the first step is satisfied. A.B., 168 Wn.2d at 911.

Where the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. Where, as here, the proof required is clear and convincing, "the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test." P.D., 58 Wn. App. at 25.

Here, Oldham asserts that, although Dr. Tutty's evaluation recommended that she receive parenting education, the Department failed to offer her that service. The record does not support this contention, considering Oldham's own testimony that, at the time of the hearing, she had been taking parenting classes at Sound Mental Health. Termination was appropriate.

"[A] parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." P. D., 58 Wn. App. at 26 (quoting In re Dependency of Ramquist, 52 Wn.App. 854, 861, 765 P.2d 30 (1988)). Moreover, even where the Department "inexcusably fails to offer a service to a willing parent . . . termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child." T.R., 108 Wn. App at 164. Finally, "[w]here the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." M.R.H., 145 Wn. App. at 25 (citing In re Welfare of Ferguson, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), rev'd on other grounds, 98 Wn.2d 589, 656 P.2d 503 (1983)).

Here, the evidence demonstrated that the parenting education service would not have remedied Oldham's parental deficiency in the foreseeable future. The record unequivocally illustrates that the parental deficiency at issue was Oldham's mental illness. Oldham's history of hospitalizations and mental health diagnoses supported this determination. Furthermore, Dr. Tutty's evaluation and testimony indicated that schizoaffective disorder adversely affects one's ability to

parent, as it impairs one's judgment, insight, ability to problem solve, and other functioning. His evaluation also stated that Oldham's disorder likely played a role in her abusive and neglectful behavior toward F.K.O. Finally, Dr. Tutty's evaluation reported that, because of her psychiatric pathology, F.K.O.'s welfare would be at risk if he were to be placed with Oldham.

The evidence adduced at trial established that Oldham's mental health condition demanded several years of ongoing support and treatment. For example, Dr. Tutty's testimony and evaluation recommended that Oldham receive extensive psychiatric treatment. This included individual counseling, routine psychiatric visits, and case management for the next 12 months. Moreover, Earwood testified that reunification would require that Oldham remain in treatment and attain mental stability for at least one year. Notably, according to Dr. Tutty's recommendations, even before *visits* with F.K.O. were to be deemed safe, Oldham would need to be stable for at least six months.

The evidence presented at the hearing also indicated that, given the recommended time frame needed for Oldham to improve her mental health condition, she would not succeed in correcting her deficiencies within the near future, as determined by F.K.O.'s age and needs. Dr. Tutty's evaluation concluded that, because of Oldham's psychiatric pathology and parenting deficits, "[i]t is highly unlikely, in this examiner's opinion, that she would be able to remediate her deficits within the time frame allowed the Department for establishing permanency."

- 12 -

At the time of the termination hearing, F.K.O. was over seven years old. According to the CASA, it was imperative that he obtain stability and permanency within two months following the hearing. Furthermore, the trial court made an uncontested finding that the "near future" for F.K.O. was 30 to 60 days. No witness testified that Oldham's parental deficiencies could be remedied in 30 to 60 days.

Finally, although the parenting services might have aided Oldham in learning to better parent F.K.O., these services were not directly aimed at treating her mental health condition. Accordingly, clear and convincing evidence supported the trial court's finding that the Department met its obligations with regard to offering or providing all necessary, reasonably available services, capable of correcting Oldham's parental deficiencies.

Nevertheless, Oldham assigns error to the trial court's finding that "[Oldham] has not successfully engaged in services nor has she made substantial progress toward correcting her parental deficiency of mental illnesses, which affects her ability to parent." This determination was similarly supported by substantial evidence in the record.

Despite the Department's efforts, Oldham did not express a willingness to comply with court-ordered services until well over a year after the March 2011 disposition order was entered. Moreover, Dr. Tutty's evaluation, which confirmed her diagnosis of schizoaffective disorder and called for extensive treatment, was completed approximately one month before the termination hearing.

Furthermore, Dr. Tutty's testimony made clear that Oldham's disorder impaired her ability to parent F.K.O.

Accordingly, substantial evidence demonstrated that, at the time of the termination hearing, Oldham had not made significant progress in improving her mental illness. Nor could she do so in the requisite near future as determined by FKO's imminent need for permanent placement. Therefore, substantial evidence supported the trial court's findings.

III

Oldham next contends that the trial court erroneously found that she was presently unfit to parent F.K.O. A finding of a parent's current unfitness is required by constitutional due process concerns. A.B., 168 Wn.2d at 920. Contrary to Oldham's contention, ample evidence in the record substantiated the trial court's finding.

As discussed previously, Oldham's parental deficiency was related to her mental illness, for which, at the time of the termination hearing, she had only recently sought treatment. In his evaluation, Dr. Tutty stated that "Oldham remains at high risk with respect to the welfare of [F.K.O.] by virtue of her psychiatric pathology and aforementioned parenting deficits." As a result, he recommended against Oldham's reunification with F.K.O. at the time of the evaluation or in the foreseeable future. Earwood agreed that Oldham posed a risk to F.K.O. such that even unsupervised visits might place F.K.O. in danger.

Moreover, Oldham's testimony demonstrated that she did not fully grasp the severity of her illness. She appeared to be dismissive of the fact that

- 14 -

remedial steps were necessary before F.K.O. could return to her care. For example, when asked about her diagnosis, she replied, "I don't even know what I have." She added that "[a]ll I know is that I take medicine and I don't have symptoms of an illness. It's a light disorder."

The CASA expressed her belief that Oldham was neither capable of providing adequate care for F.K.O. nor able to meet his developmental, physical, and emotional needs. She stated that Oldham did not comprehend how F.K.O.'s life had been affected by her illness or how her absence had impacted him. The CASA also expressed her belief that Oldham was unable to provide a stable environment for F.K.O. She explained that, in addition to his need for permanency and a decision, F.K.O. needed clear choices, specific expectations, and certainty in his daily life. She did not believe that Oldham could meet these needs.

Substantial evidence established that Oldham was not fit to parent F.K.O. at the time of the termination hearing. Accordingly, the trial court did not err by so finding.

Affirmed.

We concur:

- 15 -