IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In the Matter of the Dependency of | ) |
| | ) No. 37674-5-III |
| Z.M.Y. | ) (Consolidated with |
| | ) No. 37701-6-III) |
| | ) |
| | ) UNPUBLISHED OPINION |
| | ) |

STAAB, J. — A dependency case was initiated for Z.M.Y. in King County after her older sister reported seeing the father masturbate under a blanket with Z.M.Y. in his arms. Both parents agreed to the dependency, and Z.M.Y. was placed with the mother, on the condition that the father have no unsupervised contact with Z.M.Y. Shortly after the dependency order was entered, the family moved to Clarkston, and eventually the dependency case was transferred to Asotin County. Z.M.Y. was removed from the mother's custody after the family, including the father, was found together in a hotel room.

Eventually, the State filed a petition for termination of the parental rights of both parents. The trial court granted the State's petition for termination. Both parents appeal, alleging that there is insufficient evidence to support the court's finding that all ordered

and necessary services were provided to the parents, and it is in the best interest of the child to terminate parental rights.

We affirm the termination order as against the Father, but reverse the court's order terminating the parental rights of the mother.

FACTS

A. *Underlying Allegations*

D.M. (mother) and G.Y. (father), are the parents of Z.M.Y. born in 2012. The mother also has a teenage daughter, M.M. who is not related to the father and usually lives in another State with her aunt and guardian.

In 2016, the family was in Seattle for medical treatment, when M.M. reported that the father was masturbating in front of the children. Specifically, M.M. reported that Z.M.Y. was awake and in the same bed as the father. M.M. said Z.M.Y. "appeared unsure of what was happening" and M.M. took her out of the room while the father continued to masturbate. Ex. P-3 at 2. M.M. reported, and the Seattle Police Department confirmed, that the father is a registered sex offender due to a prior conviction for sexual abuse of a child under sixteen years old.

As a result of M.M.'s allegations, the Department of Children, Youth, Families (Department) filed dependency actions against both parents. The father denied the allegation. The mother did not believe this incident occurred but said she was willing to participate in a nonoffender parent program.

2

The court entered agreed orders of dependency as to the mother and father. At the time, Z.M.Y. was just shy of her fourth birthday. Both dependency orders recommended that Z.M.Y. remain in the mother's custody, on condition that the father not live in the home and not have contact with Z.M.Y. outside of court-ordered visits. King County had previously entered a protection order prohibiting contact between the father and Z.M.Y. that was to remain in effect until dismissal of the dependency or further order of the court.

As part of the dependencies, both parents were ordered to complete specified services. The father was ordered to complete a parenting assessment, establish paternity, complete a sexual deviancy evaluation, submit to random urinalysis testing (UA's), complete a substance use evaluation and follow all treatment recommendations. The father was also ordered to execute all releases of information to the Department relating to the father's past criminal sex abuse case. The father was to contact the Department to arrange phone or in-person visits. The father was instructed to notify the Department if he believed the services offered or provided were not adequate.

The mother was also ordered to complete services, including a parenting assessment, establish paternity, complete Harborview's "non-offending Parenting Program or similar program," and provide updates about her medical treatments if anything changed. Ex. P-4 at 9.

3

A few months after the dependency orders were entered, the father, mother, and Z.M.Y. moved to Clarkston, Washington. Concerned that the mother was allowing the father to have unauthorized contact with the child, the assigned social worker, Avril Desalme, requested a welfare check on the child. When law enforcement arrived at the hotel where the mother and Z.M.Y. were staying, the father was found sleeping in the room. The hotel clerk told law enforcement that the father was a frequent visitor. The father was arrested and charged with violating the no-contact order. Z.M.Y. was removed from the mother's custody and placed in the custody of the child's aunt, where she has remained throughout the dependency.

B. *Additional Allegations Against the Father*

During the dependency, additional allegations against the father came to light. In addition to the incident that provoked the dependency, M.M. testified that "sex was always a topic when [the father] was around." Report of Proceedings (RP) at 292. When she was alone with the father, he would repeatedly tell her that the mother would not have sex with him, tell her about sexual encounters with the mother, or tell M.M. how beautiful M.M. was. The father also hit on M.M.'s friends by telling them their bodies were beautiful and voluptuous. M.M. testified that the father made her feel uncomfortable but never touched her inappropriately. When she tried to stand up to the father, he got in her face and yelled at her, until the mother stepped in and pushed M.M.

4

out of the way, saying the father would hurt her. Aside from pushing her away, the mother never protected M.M., and the mother never told him to stop.

After being removed from her mother's custody, Z.M.Y. was placed in the custody of her aunt, Melissa Costa. Ms. Costa had known the father for years and knew of his status as a registered sex offender. She testified at trial that over the years she had witnessed the father make sexual advances toward every female in her family. In one instance, the father, while naked from the waist down, chased Ms. Costa around until she burned him with a cigarette. The father grabbed Ms. Costa by the throat and pushed her against a door so she punched the father. In another instance, the father's advances toward Ms. Costa were so aggressive that she barricaded herself in a room until he fell asleep. Ms. Costa had also witnessed the father masturbate in front of several family members.

Although she never saw him act aggressively toward his daughter, Ms. Costa frequently watched the ather touch himself and other people in front of the child. Ms. Costa testified that she believed the father had sexually abused the child. She based her belief on statements made by Z.M.Y. along with overly sexual behavior displayed by Z.M.Y.

The child's therapist also testified that she believed the father had abused Z.M.Y. Heather Cochrell works for Quality Behavior Health in Clarkston and is the program manager for the agency's Community Sexual Assault Program (CSAP). Ms. Cochrell

conducted a mental health assessment on Z.M.Y. and was her assigned therapist before Z.M.Y. moved into CSAP therapy. Ms. Cochrell testified that she believed the father had sexually abused Z.M.Y. She based her opinion on the statements by the child and Z.M.Y.'s uncharacteristically sexualized behavior. Ms. Cochrell testified that a child's sexual behavior "can be" an indicator of sexual abuse. RP at 397.

Concerned that Z.M.Y. was being abused, the therapists at Quality Behavior Health contacted law enforcement. Officer Bryon Denny, a certified child forensic interviewer with the city of Clarkston Police Department, was asked to participate in several forensic interviews with Z.M.Y. The first interview occurred in June 2017, shortly after the child was removed from the mother's custody. Z.M.Y. initially indicated that her mother had touched her butt, but then revised it to say that her father had touched her butt. Z.M.Y. was unable to consistently relay details about this incident, indicating it occurred inside, but later saying it occurred it the car. Z.M.Y. did indicate that the father had touched her in the genital area and it "bleeded" but then pointed to her arm to indicate where she was bleeding. RP at 131. Eventually, Z.M.Y. shut down, and Officer Denny terminated the interview.

Officer Denny was contacted three months later after Z.M.Y. raised her hand in school during a good touch/bad touch presentation and told the advocate that her father "did a bad touch." RP at 133. During this second interview, Z.M.Y. told Officer Denny that "her daddy did yuckies in front of" her. RP at 133. Similar to the first interview,

6

Z.M.Y. had difficulty staying on track and engaged with the conversation. When asked what "yuckies" meant, she pointed to her genitals and said "he was snoring and that both eyes were open." RP at 133. The incident occurred at night in a motel with the father, mother, and M.M. when they went to see the doctor, but she did not know where it occurred. She said the father was on the lower bed bouncing up and down and she saw her father's privates one time.

Two months later, Detective Jackie Nichols conducted a third forensic interview of Z.M.Y. Again, Z.M.Y. wandered off topic and talked about seeing ghosts. She did tell Detective Nichols that the "uckies" happened with her "real dad," and put play dough in her crotch to show where uckies were, but her statements were not clear. RP at 153. Z.M.Y. went on to say that "her dad wanted to do uckies with her and that they had jammies on and that they were under a blanket." RP at 156. The uckies had not happened with anyone else. While Detective Nichols believed this occurred in Seattle, she was unable to identify where and when the crimes occurred. She did not believe she had enough information to request criminal charges. Nonetheless, Detective Nichols believed that the father had abused Z.M.Y.

The following year, in July 2018, Kimberly Belton was supervising a visit between the father and Z.M.Y. While she generally stayed in another room during these visits, she became concerned that the interactions were "becoming pretty touchy" so she moved to the same room and sat in a chair across from the father. RP at 166. Z.M.Y.

7

was moving on and off the father's lap, and Ms. Belton could see the child was becoming uncomfortable. While the father was pulling Z.M.Y. back on his lap, it was clear that she was trying to push away. Ms. Belton cued the father to let the child get off his lap, and when Z.M.Y. got down, Ms. Belton realized that the father had a visible erection. As a result of this incident, the father's visitations were terminated until he could show compliance with his sex offender treatment.

Two months after the father's last visitation, Officer Denny observed a fourth forensic interview of Z.M.Y. conducted by an interviewer from Partners with Family and Children in Spokane. Officer Denny testified that during the interview, Z.M.Y. said "she couldn't see her dad anymore because it was private" and that "it was a private part he used on her," but then Z.M.Y. changed the subject. RP at 136. Officer Denny testified that Z.M.Y. "said that he touched her on her privates and then pointed to her genital area. [Z.M.Y.] said he did it because he could when he couldn't," then she changed the topic again. RP at 136. Z.M.Y. said she told the mother what happened, and she did not believe her, but her foster mom did. Z.M.Y. said the touching happened once, the father used his hand, clothes were on, and the touching was outside of the clothes. Z.M.Y. demonstrated the touch with an open hand. Z.M.Y. said the father touched her butt, but pointed to her genitals; she said it felt bad when he did this. Z.M.Y. said there was more that happened, but she did not want to talk about it. Ms. Williams asked Z.M.Y. if she

8

could come later to talk about it, Z.M.Y. agreed, so another interview was scheduled for October 3, 2018.

At the fifth forensic interview, Z.M.Y. told the interviewer that she did not have visits with the father anymore because he did bad things. Z.M.Y. again said he touched her privates over her clothes. She said the father came to Z.M.Y.'s bed while the mother was sleeping. The mother woke up and asked the father what he was doing, and he responded, "nothing you need to know." RP at 137. Z.M.Y. said the mother did not see what the father was doing. Z.M.Y. said this all happened at her house and that it was just one time. She said the father never showed Z.M.Y. his privates and Z.M.Y. never saw him touch his own privates. Z.M.Y. said there was nothing more to talk about.

When Ms. Williams asked Z.M.Y. about what happened at the motel, Z.M.Y. said "Daddy wasn't doing good things," and she could not talk about it because it was private. RP at 137-38. Z.M.Y. said this was different from what they already talked about. After the interview, Officer Denny and Ms. Williams spoke, and it was their belief that "clearly something happened." RP at 138. However, unless she made more disclosures, it would not be productive to do more interviews until Z.M.Y. had time in counseling and had grown up a little.

C. *Additional Allegations Against the Mother*

Throughout the dependency, the primary allegation against the mother had been her failure to recognize the danger posed by the father and the mother's failure to protect

Z.M.Y. from the father. While the mother was apparently asleep when M.M. witnessed the father masturbating near Z.M.Y., M.M. testified at trial that the mother later told M.M. that she should not have reported the incident and blamed M.M for the dependency. When the father would get aggressive with M.M., the mother would not protect M.M. or tell the father to stop.

As noted above, Ms. Costa, the mother's sister, witnessed numerous instances of the father conducting himself in a sexually inappropriate manner in front of Z.M.Y. The mother would not stop the father from acting this way in front of Z.M.Y. When this behavior was pointed out to the mother, she would minimize the father's behavior and assure Ms. Costa that the father would never do anything to Z.M.Y. Ms. Costa believed the mother was in denial and would always protect the father over Z.M.Y.

Therapist Heather Cochrell testified that she did not believe the mother would protect Z.M.Y. Z.M.Y. reported in therapy that when she told her mother what the father had done to her, the mother told Z.M.Y. to tell the father to stop, but did nothing more to protect Z.M.Y.

Social Worker Bologova testified that the mother made it clear that she was not living with the father and was not allowing him contact with Z.M.Y., but was then found in a hotel room with the father and Z.M.Y. in violation of the order on dependency.

Asotin County Social Worker Desalme testified that she was also concerned about the mother's unwillingness to protect Z.M.Y. from the father. Ms. Desalme told the

mother that she was concerned about returning Z.M.Y. to the mother if she was in an active relationship with the father. The mother told Desalme that she did not think therapy would help because the father did not do anything wrong. RP 16.

Over the course of the dependency, the mother and father's relationship was off and on. During that time, the mother would vacillate between believing the father had not abused Z.M.Y. and wanting nothing to do with the father. In 2020, after the mother declared that she was not in a relationship with the father, Desalme learned that the two had married a few months earlier.

### D. Termination Proceedings

In April 2019, three years after the dependency was entered, the State filed for termination of the parents' rights. Trial commenced in July 2020. The State called several witnesses who testified about the allegations against the parents, the services that had been ordered as part of the dependency, and the parents' compliance with these services.

1. *Testimony/Evidence of the father's compliance with services ordered.*

Social worker Bologova testified that the father was ordered to obtain several services including: a parenting assessment, establish paternity, obtain a sexual deviancy evaluation and follow any recommended treatment, provide random urinalysis testing, obtain a drug and alcohol evaluation and follow any recommended treatment.

11

The father did not obtain a sexual deviancy evaluation until October 2018, more than two years after the dependency order was filed. The father was found to be a moderate risk to reoffend, assuming he was in compliance with treatment but was also found to be less amenable to sex offender treatment than the average examinee.

The father was supposed to start sex offender treatment in May 2019, but did not show up for several appointments. He eventually started treatment in October 2019.

Over the next few months, his attendance was spotty. And on June 17, after missing all but one group session in the last three months, the father was discharged from the program for nonattendance, lack of participation, and lack of progress. The father never reengaged in treatment. The treatment counselor testified that the father needed about two years of treatment to be successful.

The father's compliance with drug and alcohol abstinence and treatment was mixed. The father's community corrections officer testified that during 2019, the father was sanctioned several time for positive UAs. However, the father presented testimony from a physician working at Ideal Options Treatment Center, who testified that the father was successfully enrolled in a medically assisted treatment program for opioid abuse from June 2018 to March 2020. The father was seen at the agency every two weeks and provided a UA at each visit. While some of these UA tests were positive for illicit drugs, many of them were negative. The father was considered in compliance at his last visit.

The father was also in substance abuse treatment at Quality Behavior Health off and on from November 2016 to the time of trial. When he did attend sessions, he participated effectively in group, but his attendance was inconsistent. At the time of trial, the father had not provided a UA for over six months.

2. *Testimony/Evidence of the mother's compliance with services ordered.*

The State also presented testimony on the mother's compliance with services. The mother was initially ordered to obtain a parenting assessment, establish paternity, and comply with the Harborview Center for Sexual Assault and Traumatic Stress (nonoffender Parenting Program) or similar program.

Social worker Bologova testified that once the mother moved to Clarkston, the Harborview Program was no longer reasonable. However, the program could be substituted with appropriate therapy that focused on understanding child sexual abuse, its implications, how it happens, what to be aware of, how to intervene, the impact on the child, and the long-term effects. Bologova contacted Quality Behavior Health in Clarkston and made arrangements for this agency to provide services similar to the nonoffender program. Quality Behavior Health advised Bologova that they would be able to provide this service to the mother so long as she signed the consent form for services.

Asotin County Social Worker Desalme testified that she was assigned to the case in December 2017, after the family moved to Clarkston. It was Ms. Desalme's

understanding that Bologova had already arranged for nonoffender services through Quality Behavior Health before she was assigned the case.

Katherine Troutman, a therapist and advocate at Quality Behavior Health, testified that she met with the mother for one hour in August 2018. During that meeting, she updated the mother's consent for services, signed a release of information, completed a housing application, and "provided support and advocacy." RP at 378. When asked if she was providing the mother with nonoffender services, Ms. Troutman said, no. Ms. Troutman also testified that Quality Behavior Health does not offer a nonoffender program and she had never put together a treatment plan for nonoffender services. Ms. Troutman indicated that she scheduled four follow-up therapy sessions but the mother failed to appear for any of these appointments. There was no indication that any of these sessions were intended to provide nonoffender services or similar therapy.

Tina Overstreet from Quality Behavior Health testified that the mother completed a substance use assessment on October 31, 2019, which recommended no treatment.

3. *Trial court's findings and conclusions.*

At the conclusion of evidence, the trial court entered detailed findings of fact. The court found that the father is a convicted sex offender who continues to demonstrate deviant sexual behavior in the presence of the child. There is also evidence that the father had abused the child. The father had failed to comply with sex offender treatment and substance use treatment. The court also found that the mother failed to protect

14

Z.M.Y. from the father's deviant behavior. The court found that both parents had been offered all ordered and necessary services to address and overcome these deficiencies, but the child remains in grave danger from future sexual abuse or exploitation from the father's actions and the mother's failure to protect the child from the father. The court concluded that the statutory factors had been met and termination was in the child's best interest.

Both parents have appealed the order terminating their parental rights.

ANALYSIS

As a reviewing court, our role is limited to assessing whether substantial evidence supports the trial court's findings. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020).

A. *Law on Termination*

While our role on appeal is limited, we nonetheless recognize the substantial rights at stake in this case. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a fundamental liberty interest in the custody and care of their children, the Department may terminate parental rights "'only for the most powerful [of] reasons.'"

*In re Termination of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in

original) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

The termination of parental rights is a two-part process at trial. First, the trial

court considers whether the parents are fit. To meet its burden of proving that the parents

are unfit, the Department must prove the six elements in RCW 13.34.180(1) by clear,

cogent, and convincing evidence. RCW 13.34.190(1)(a)(i).

The second part of the analysis focuses on the child. If the Department can meet

its burden of showing that the parents are unfit, it must then prove, by a preponderance of

evidence that termination is in the best interest of the child. RCW 13.34.190(1)(b). *In re

Welfare of A.B.*, 168 Wn.2d 908, 911-12, 232 P.3d 1104 (2010).

In this case, both parents claim that the Department failed to prove that the parents

were unfit. More specifically, they each allege that the State failed to prove that the

Department had provided all necessary services to the parents. One of the six statutory

elements in a termination proceeding is proof that the Department has offered all

necessary services capable of correcting the specific parental deficiencies within the

foreseeable future. RCW 13.34.180(1)(d). "The Department has a statutory obligation to

provide all the services ordered by the permanency plan, as well as 'all necessary

services, reasonably available, capable of correcting the parental deficiencies within the

foreseeable future.'" *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75

(2016) (quoting RCW 13.34.180(1)(d)). The term "'necessary services'" has been

defined to mean "those services 'needed to address a condition that precludes reunification of the parent and child.'" *Id.* at 480 (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

B.  *Application to Father's Case*

For the first time on appeal, the father argues that housing assistance was a necessary service because his lack of stable housing was preventing him from reunification with his daughter. During trial, social worker Avril Desalme testified that the father would need to do several things before she would support reunification with Z.M.Y. These included:

> Full engagement; participation and completion of his sexual deviancy treatment; addressing his substance use, which has been an issue since the beginning of this dependency; some stability and clean time; housing. Allegations—there have been allegations throughout this dependency on [father], ah, sexual allegations, so those not happening anymore.

RP at 25-26. On appeal, the father focuses on Ms. Desalme's mention of housing to argue that his lack of stable housing prevented reunification so housing assistance was a necessary service that the Department did not provide.

The father's argument fails for several reasons. First, housing assistance is generally not one of the services provided by the Department. As noted above, the Department must prove that it provided all services ordered by the permanency plan as well as those necessary to address a condition that precludes reunification. *K.M.M.*, 186 Wn.2d at 480. Since housing assistance was not ordered in the father's dependency, we

17

must decide whether these services were nonetheless necessary to reunify the father and child.

Housing assistance is generally not a service provided during a dependency. Remedial services are those services available in a dependency action that facilitate the reunification of the parent and child in a safe and timely manner. RCW 13.34.025(2)(a). "Housing assistance" is specifically precluded from the definition of remedial services: "For purposes of this chapter, 'housing assistance' is not a remedial service or family reunification service as described in RCW 13.34.025(2)." RCW 13.34.030(13). However, if homelessness is a primary factor preventing reunification, the court may order some form of housing assistance. RCW 13.34.138(2)(c)(i); *Washington State Coal. for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 901, 949 P.2d 1291 (1997).

In this case, it is clear from the evidence, and the trial court's findings, that lack of housing was not the primary parental deficiency that prevented reunification with the child. Instead, the father's ongoing pattern of sexual deviant behavior along with his failure to engage in sex offender treatment and substance abuse treatment were the primary concern for the trial court. Providing the father with housing assistance would not have remedied these deficiencies.

The father also assigns error to several of the trial court's findings that he continues to engage in a pattern of sexually deviant behavior that leaves the child in

18

grave danger of sexual abuse by the father.  More specifically, the father argues that there

is insufficient evidence that his sexual behavior was deviant or that he sexually abused

Z.M.Y.  The trial court made the following relevant findings:

4.    The father is a convicted sex offender, currently designated as a level 3 sex offender.

5.    There has been presented clear, cogent and convincing evidence that the father has engaged in an ongoing pattern of sexually deviant behavior which resulted in the initiation of the dependency action and which has continued during the pendency of the dependency process.

6.    The father has failed to comply with sex offender treatment offered by The Department and has been discharged from a qualified sex offender treatment program due to lack of attendance.

7.    The father has not followed through with substance abuse treatment and testimony provides clear, cogent and convincing evidence that he is an unrehabilitated polydrug abuser.

8.    Reliable reporters have described actions by this child that are sexual in nature and unusual for a child of her age.

9.    A counselor with specialized training and experience in the area of sexual abuse testified that the sexualized acting out exhibited by this child was evidence of prior sexual abuse.

10.   Testimony has been presented that the father engaged in inappropriate sexual activity or displays in the presence of this child and an older minor child step-sister and that he has been sexually inappropriate with a number of other female individuals.

11.   The child has twice been removed from the care and custody of the mother based on her unwillingness or inability to protect the child from the father.

Clerk's Papers at 140-41.

19

On review, "[t]he court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue. *S.J.*, 162 Wn. App. at 881. "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *K.S.C.*, 137 Wn.2d at 925. "The trial judge has the advantage of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." *Id.* Reviewing courts may not decide the credibility of witnesses or reweigh the evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

Contrary to the father's argument on appeal, these findings are supported by substantial evidence. The father had been previously convicted of sexual abuse of a child under 16 in Idaho, and at the time of trial was a level three sex offender. The dependency action commenced because Z.M.Y.'s older sister reported that the father was masturbating under a blanket with Z.M.Y. in his arms. There was also significant evidence that the father exhibited highly sexualized behavior and was sexually aggressive with numerous females, including M.M.'s friends. During the father's last visit with Z.M.Y., the supervisor observed him pulling Z.M.Y. back on his lap and when Z.M.Y. was finally able to get away, the father exhibited a visible erection. This evidence

supports the trial court's findings that the father was continuing to engage in an ongoing pattern of sexual deviant behavior.

The father also challenges the trial court's finding that he had sexually abused Z.M.Y. The court found that Z.M.Y. exhibited sexualized behavior that was uncharacteristic for a child this age and at least one counselor testified that this was evidence of prior sexual abuse. Substantial evidence supported these findings.

During several forensic interviews, the child disclosed that the father had touched her on her privates and did "yuckies" or "uckies." She exhibited uncharacteristic sexualized behavior, like public masturbation, and told people she learned this behavior from her parents. While one of the State's sexual assault therapists testified that sexual behavior "can be" evidence that a child has been abused, after interviewing Z.M.Y., this expert firmly believed that she had been abused by the father.

The father points out that he was never charged with a crime, and argues that if the allegations do not meet the threshold standard of probable cause, they cannot meet the more exacting burden of clear, cogent, and convincing evidence. Several of the State's witnesses testified that they believed the father had abused the child. Detective Bryon Denny indicated that charges would not be filed because the young child could not pinpoint the time, jurisdiction, or specific nature of the allegations. While these elements are necessary for a criminal charge, they are not necessary for a termination trial to determine whether a parent abused a child.

21

Finally, the father argues that there was no evidence his behavior had not been remedied at the time of trial, or that it prevented him from providing for the child's basic needs. The State presented evidence that the father had been ordered to complete a sexual deviancy evaluation and follow any recommended treatment. When the father finally appeared for an evaluation, he was found to be a moderate risk for acting out sexually (assuming he was compliant with treatment) while less amenable to sex offender treatment than the average examinee. In October, the father began treatment, attended sporadically over a few months, and was discharged in June for lack of attendance.

The father correctly notes that his parenting deficiencies must render him incapable of meeting Z.M.Y.'s basic needs to warrant termination. However, this means "providing the child with 'basic nurture, health, or safety,'" which would include not subjecting her to sexual abuse and displays of sexual activity. *In re Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014). The father's sex offender therapist testified that it would take two years of therapy for the father to complete treatment. Two years is not the "near future" for an eight-year-old child who has spent half her life in foster care.

Finally, the father argues that the Department failed to prove that termination of his parental rights was in the best interest of Z.M.Y. As noted above, termination is a two-part process. If the Department proves a parent is unfit, it must then prove, by a preponderance of evidence that termination is in the child's best interest. RCW 13.34.190(1)(b); *In re Welfare of A.B.*, 168 Wn.2d at 911-12.

The father contends that the Department used removal as a first option instead of a last resort and then deprived the father of meaningful opportunities to develop a bond with Z.M.Y. The record does not support this argument. Z.M.Y. was originally placed with the mother after being found dependent. The child was only removed after both parents violated the order prohibiting the father from having unsupervised contact with the child. The father was provided with supervised visits with the child, but these were suspended when he displayed deviant behavior toward the child at a visitation. The father was told he could resume visits if he engaged in sex offender treatment, but chose not do so. The trial court found that Z.M.Y. was exhibiting significant behavior problems that could be partly attributed to the ongoing dependency. The court's conclusion that termination was in the best interest of Z.M.Y. was supported by the court's findings and the evidence at trial.

There is substantial evidence in the record to support the trial court's finding that the father was unfit to parent Z.M.Y. and that termination was in her best interest.

C. *Application to Mother's Case*

The mother also appeals, arguing that the evidence does not support the trial court's finding that the Department offered all services ordered. Specifically, the mother argues that she was never offered nonoffender parenting classes. Although the mother disputed the allegations against the father, she agreed to an order of dependency that allowed Z.M.Y. to remain with her. The order of dependency prohibited the father from

23

living in the home or having unsupervised contact with Z.M.Y.  The order of dependency also required the mother to complete the Harborview Center for Sexual Assault and Traumatic Stress (nonoffender parenting program) or similar program.

The trial court found that the Department had made available to the mother all necessary services including nonoffender sexual abuse counseling.  This finding is not supported by substantial evidence.  During the trial, social worker Olga Bologova testified that these services were originally offered in Seattle.  Shortly after the commencement of the dependency action, the parents moved to Clarkston.  Ms. Bologova testified that she contacted Quality Behavioral Health in Clarkston and made arrangements for this agency to provide similar services to the mother.

The mother met with Katherine Troutman, a therapist at Quality Behavioral Health one time in August 2018.  Ms. Troutman testified that the purpose of the visit was to "provide support and advocacy" to the mother.  RP at 378.  When asked specifically whether she was providing services related to being a nonoffending parent, Ms. Troutman said no.  Ms. Troutman testified that she had never put together a plan for nonoffender services, that Quality Behavior Health did not have a program for nonoffender services, and that she was not aware of the mother ever receiving nonoffender services through Quality Behavioral Health.  Ms. Troutman testified that the mother failed to attend four scheduled appointments with her, but these were for "therapy," appointments.  RP at 380.

The Department argues that despite Ms. Troutman's testimony, the missed therapy sessions at Quality Behavioral Health were intended to provide services similar to a nonoffender program. It is true that nonoffender services did not need to be provided in a formal program but could be provided through individual therapy sessions. And it is also true that Quality Behavioral Health provides services to victims and survivors of sexual assault that are similar to a nonoffender program. But it is not clear, cogent and convincing that Ms. Troutman was actually providing substitute nonoffender services to the mother. Ms. Troutman clearly did not believe so.

The Department also argues that providing the mother with nonoffender services would have been futile. The Department is excused from offering or providing services otherwise required if doing so would be futile. *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 924, 385 P.3d 268 (2016). It is well settled that the statutory requirement to offer or provide corrective services does not contemplate an entirely one-way process, and "a parent's unwillingness or inability to make use of the services provided excuses the state from offering extra services that might have been helpful." *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) (citing *In re Welfare of Ferguson*, 41 Wn. App. 1, 6, 701 P.2d 513 (1985)).

In this case, the Department argues that providing nonoffender services to the mother was futile because the mother insisted that the father was not doing anything wrong and continued her relationship with the father even after being told of its

detrimental effects on Z.M.Y. This is a circular argument. The whole purpose of nonoffender services is to educate a parent on the signs of abuse, the long-term impacts of this abuse on a child, and how to intervene and protect the child. It may very well be true that nonoffender services will do nothing to change the mother's perception, but "services are not futile just because they are not guaranteed to succeed." *In re Parental Rights to B.P.*, 186 Wn.2d 292, 322, 376 P.3d 350 (2016).

The State also contends that the services are futile because the mother failed to appear for four scheduled sessions with Ms. Troutman. Typically, a pattern of unwillingness to engage is sufficient to establish that offering additional services was futile. *Ramquist*, 52 Wn. App. at 861. As noted above however, there is no evidence that Ms. Troutman was providing nonoffender services. Nor is there evidence that the mother was told that Ms. Troutman's therapy sessions would qualify as nonoffender services. We cannot find that the mother was unwilling to engage in services when there is no evidence that she was aware that those services were being offered.

CONCLUSION

We recognize that reversing the termination order against the mother will have detrimental effects on Z.M.Y. Placing the child back in a dependency proceeding will continue to bring uncertainty and instability to this child. Before terminating a parent's rights, however, we must be convinced that every effort has been made to remedy the parent's deficiencies.

26

We hold that the trial court's finding, that the Department provided the mother with nonoffender services as ordered by the dependency order, is not supported by substantial evidence. Without this finding, the State cannot meet its burden of proof and the termination order as to the mother must be reversed. Because we reverse the mother's termination, we need not address her allegation that the Department also failed to provide the mother with substance abuse treatment. This issue can be addressed by the parties as part of the dependency below.

Affirm in part, reverse in part.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.