[No. 12814-8-III.   Division Three.   June 20, 1995.]

*In re the Welfare of* A.J.R.

Sharon T. Robinson, et al., *Appellants*, v.
Department of Social and Health Services,
*Respondent.*

*Karen C. Koehmstedt* and *Laurence S. Moore*, for appellants.

*Louis B. Byrd, Jr., Assistant Attorney General*, and *Kevin M. Hartze, Assistant Attorney General*, for respondent.

SWEENEY, J. — Sharon and Marty Robinson appeal an order terminating their parental rights in their daughter A.R. They contend the State failed to prove that necessary services were offered or provided to help them correct their parenting deficiencies. They also argue the State failed to comply with the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, by making no effort to modify parenting classes or other training services to accommodate their mental impairments. We affirm.

## FACTS AND PROCEDURAL POSTURE

A.R., born December 1, 1990, is the only child of the Robinsons. Sharon Robinson is moderately developmen-

tally disabled and her husband Marty is borderline developmentally disabled. Their daughter also has special needs and requires special education and treatment to develop to her full potential.

The State first filed a dependency petition on March 18, 1991, based on a report that Marty was alleged to have raped a woman in the presence of his wife and A.R.. This dependency was dismissed on May 16, 1991.[1] A second dependency petition was filed on September 17, 1991, alleging Sharon and Marty neglected and/or abused A.R.. The petition also alleged A.R. had no parent capable of adequately caring for her at that time.

A.R. was found to be a dependent child on October 10, 1991. The dispositional plan adopted by the court placed her in foster care arranged by the Department of Social and Health Services (DSHS) and allowed parental visitation. The court ordered the following services for the parents: caseworker services, guardian ad litem services, parenting classes, psychological evaluations and counseling services, including a drug and alcohol evaluation and follow-up treatment for Marty.

Dependency review hearings were held on February 27 and April 2, 1992. Additional services were offered to the Robinsons during this period, including marriage counseling, Department of Developmental Disabilities (DDD) services for Sharon and A.R., classes for A.R. at the Developmental Center, and public health services.

From the beginning of the dependency period, Marty was somewhat uncooperative. He was unhappy with the "alternative living providers"[2] assigned to Sharon by DDD and occasionally refused to let them enter the house, eventually "firing" two of them. Although a caseworker repeatedly urged him to apply for available funding,

---

[1]Marty pleaded guilty to fourth-degree assault on May 23, 1991, and was sentenced to one year, suspended.

[2]The "alternative living providers" were private individuals under contract to DDD who were assigned to help Sharon shop, improve her personal hygiene, clean house, and learn to cook.

Marty claimed he was unable to afford the drug and alcohol evaluation. Eventually, he submitted to the evaluation, but did not return for the recommended follow-up treatment. Sharon regularly complained to service providers that Marty was smoking marijuana.

DSHS filed a petition to terminate parental rights on May 1, 1992, alleging the parents had not complied even minimally with the court-ordered services and that Sharon's and Marty's parental rights should be terminated. At the termination hearing held October 12 through 16, 1992, both parents were represented by counsel. The State presented the testimony of 15 doctors, psychologists, detectives, social workers, and service providers who testified that all reasonably available services had been provided or offered to the Robinsons.

Public Health Nurse Susan Dezember testified she provided Sharon with prenatal and postnatal care and in-home infant care for the first eight months of A.R.'s life. Ms. Dezember made over 50 contacts with the family during this time and testified the home was always very dirty, with dog feces[3] and urine on the floors, dangerous clutter in the crib and playpen, and bottles of formula left unrefrigerated. The baby was often unfed and very hungry when Ms. Dezember arrived, yet did not cry—a sign, Ms. Dezember felt, that the baby did not expect the parents to respond.

When she realized Sharon was unable to remember how to dilute the baby formula, Ms. Dezember arranged to supply her premixed formula. Recognizing the limitations of the Robinsons, Ms. Dezember explained step-by-step basic nutrition, health care, cleanliness, and child care to Sharon. Marty was often gone when Ms. Dezember arrived, so she drew pictures describing her instructions and attached them on the refrigerator for him to see.

In Ms. Dezember's opinion, the best option for keeping

---

[3] Ms. Dezember testified she saw A.R. eat some of the dog feces during one visit and had to clean it off the baby's hands and face and out of her mouth.

the family together while ensuring provision for A.R.'s special needs was live-in supervision, but that option was not available. She therefore felt that termination was in the best interests of A.R.

DSHS caseworker Teresa St. John testified that in the few months before A.R. was removed from the home, some kind of care provider came into the home every day, especially to make sure the baby was fed. Ms. St. John reported she usually found dog feces on the floor, which Sharon refused to clean up. After receiving a Child Protective Services report that Marty had shaken and spanked A.R., Ms. St. John confronted him. Marty picked up A.R. and demonstrated how he had spanked the baby. When Ms. St. John told him that was too hard, he left the house angry and "fired" the public health nurse for reporting the spanking. Ms. St. John had been trained in working with the developmentally disabled. In her opinion, all reasonable services had been provided to the parents, but the services available were not enough to correct the family's deficiencies and would not be enough in the future.

Primary caseworker Cathy Hanson testified DSHS attempted to find a group home which would accept A.R. and her parents, but could not find one. DSHS also contacted three or four foster homes in the area which were licensed to take a developmentally disabled mother and child, but all were full. Billye Harbison, one of the Robinsons' care providers, offered to have Sharon and A.R. live with her, but Sharon and Marty refused. Marty could have been included in the living arrangements, but he refused to become eligible for DDD benefits due to the stigma associated with it. Neither Sharon nor Marty had relatives with whom they were willing to live.

DDD caseworker Mary Jo Byers kept a log book which detailed her interactions with the Robinsons from October 1989 through July 1992. In it she documented Sharon's preoccupation with Marty's drug use and fears he would bring home another woman if she moved into a foster home with A.R. Ms. Byers developed an individual service

plan for the alternative living providers to train Sharon to cook, clean, and arrange appointments independently. The first alternative living provider assigned to Sharon quit after what appeared to be a marijuana cigarette fell out of Marty's pocket on the first day of her service. Another alternative living provider, Elena Alexander, testified she gave Sharon cooking, cleaning, and basic child care lessons in the home. Ms. Alexander had 10 years' experience working with developmentally disabled clients. In her opinion, Sharon was capable of cooking, cleaning, and caring for the baby, but she chose not to.

Sharon Hickman taught the parenting class the Robinsons attended in the spring of 1992. A health department public nurse, Ms. Hickman, testified she recognized the couple's disabilities and attempted to modify her teaching to make all the information available to them. In order to accomplish this, she restricted herself to verbal communication rather than reading assignments, put the Robinsons in the front of the class, and used videotapes. Sharon and Marty attended all but one of the classes and received their certificate, but Ms. Hickman felt the couple made no progress in their capability to parent A.R.

When A.R. was first placed in the foster home, she was suffering with a severe, bloody diaper rash which she had had for some time. By the time of the guardian ad litem's report four months after her removal from her parents, the rash was gone, A.R. was "making her needs known", and she was no longer having nightmares. The guardian ad litem reported the Robinson home continued to be filthy after A.R.'s removal, smelling overwhelmingly of dog feces, urine and dirty dishes. She also expressed fears that Marty was physically abusing Sharon, an observation Sharon would neither affirm nor deny. Marty blamed DDD for not keeping their house clean and for not teaching Sharon to cook or clean. In the guardian ad litem's opinion, A.R. could not be returned to the Robinson home under these conditions.

Dr. Bruce Duthie, a psychologist, conducted psychologi-

cal evaluations of Sharon and Marty. He testified that Sharon did not have the capacity to parent A.R. in an effective manner long term. He also stated he felt it was highly unlikely her parental deficiencies could be remedied so that A.R. could return home. Dr. Duthie testified Marty's parental deficiencies could not be corrected in the near future and recommended terminating the parental rights of both parents.[4]

After hearing the testimony of the State's witnesses as well as the testimony of the parents and Marty's mother, father, and uncle, the court entered an order terminating parental rights on December 3, 1992. Both parents appeal.

### DISCUSSION

■ The appeal challenges the sufficiency of the evidence to support termination of the Robinsons' parental rights. We "must uphold the trial court's factual findings if they are supported by substantial evidence". *In re A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). The State must establish with a preponderance of the evidence that termination of parental rights is in the best interests of the child. RCW 13.34.190(4).

■ The trial court has broad discretion to terminate parental rights if it finds that the State provided clear, cogent and convincing evidence:

(1) That the child has been found to be a dependent child under RCW 13.34.030(2); and

(2) That the court has entered a dispositional order pursuant to RCW 13.34.130; and

(3) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency under RCW 13.34.030(2); and

---

[4]Dr. Duthie's evaluation also notes that Marty denied drug or alcohol use and denied a criminal history beyond the fourth degree assault and a brief incarceration for failure to pay a fine. Marty actually has a history of chemical abuse and criminal activity, including burglaries, forgery, and criminal trespassing.

(4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and

(5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and

(6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home;

Former RCW 13.34.180. *See also* RCW 13.34.190(1); *In re A.W.*, 53 Wn. App. 22, 30-31, 765 P.2d 307 (1988), *review denied*, 112 Wn.2d 1017 (1989).

■ Parents have a fundamental liberty and privacy interest in the care and custody of their children. *In re J.B.S.*, 123 Wn.2d 1, 12, 863 P.2d 1344 (1993). Permanent deprivation of parental rights should be allowed only " 'for the most powerful reasons' ". *In re Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973) (quoting *In re Day*, 189 Wash. 368, 65 P.2d 1049 (1937)). When parental actions seriously conflict with the mental or physical health of their child, however, the State has a right and responsibility to intervene to protect the child. *In re Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980).

The Robinsons contend the State failed in its burden to prove that all the services "reasonably available" had been offered or provided. RCW 13.34.180(4). They argue that the services offered did not address their special needs as developmentally disabled parents. We disagree. The State provided services which were modified to accommodate the Robinsons' specific disabilities. Pictorial instructions were left on the refrigerator. Daily lessons on basic hygiene, cooking, and child care were provided. Visual rather than literary teaching aids were used in the parenting class.

■ For the same reasons, we reject the Robinsons' Americans with Disabilities Act (ADA) claim. They con-

tend that the State's failure to provide specialized parenting classes violated the ADA. The ADA prohibits a public entity from discriminating against disabled persons by excluding them from participation in or denying them the benefits of public services and programs. 42 U.S.C. § 12132. The Act requires the state or other public entity to make reasonable accommodations to allow the disabled person to receive the services or to participate in the public entity's programs. 28 C.F.R. § 35.130(b)(7) (1994). As applied by the various State agencies here, RCW 13.34.180(4) resulted in reasonable accommodation of the Robinsons' disabilities. We have already outlined in some detail the specific services tailored to their developmental disabilities.

In sum, all reasonably available services were provided to the parents; these services were modified by the individual providers to accommodate their special needs; and, most importantly, the court's finding that the best interests of the child were met by termination of parental rights is amply supported by clear, cogent and convincing evidence. *A. V.D.*, at 571.

Affirmed.

THOMPSON, C.J., and MUNSON, J., concur.

Review denied at 127 Wn.2d 1025 (1995).