IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 74910-2-I |
| | ) | |
| T.S., | ) | DIVISION ONE |
| DOB: 04/24/11, | ) | |
| | ) | UNPUBLISHED OPINION |
| Minor Child. | ) | |
| | ) | FILED: November 21, 2016 |
| | ) | |

BECKER, J. — After a dependency of more than three and a half years, the juvenile court entered an order terminating the appellant father's parental rights to his daughter. The father challenges the sufficiency of the evidence supporting several of the juvenile court's findings necessary for termination. He also claims that the court violated his right to due process by terminating his parental rights based on a parental deficiency of which he did not receive adequate notice. The father fails to establish a due process violation, and substantial evidence supports the court's findings, which in turn support the order of termination. We affirm.

FACTS

Tyrell Shavers, born in 1980, is the father of T.S., born on April 24, 2011. T.S. has never lived with Shavers. T.S. lived with her mother until she was almost a year old. Shavers was "minimally involved" in T.S.'s life. In March

2012, T.S. and her two older brothers who are unrelated to Shavers were removed from their mother's care. Three months later, in June 2012, Shavers agreed to a dependency and dispositional order for T.S. According to the agreed order, T.S. was dependent because she had no parent or guardian or custodian capable of adequately caring for her. See RCW 13.34.030(6)(c).

The dependency order established that Shavers has significant criminal history that includes crimes related to illegal drugs. Shavers was convicted of a drug crime in 1994. In 1997, he was convicted of manslaughter after he shot and killed a man during a drug transaction. After serving an 11-year sentence for that crime, Shavers was released from prison and ordered to participate in substance abuse treatment as a condition of supervision. He violated a condition of supervision by consuming marijuana. It is unknown whether he engaged in court-ordered drug treatment. In 2010, Shavers received a deferred sentence for a drug conviction involving oxycodone. His deferred sentence was later revoked.

The dispositional order required Shavers to establish paternity, participate in twice weekly random urinalysis for 90 days, obtain a drug and alcohol evaluation and parenting assessment, and follow any treatment recommendations resulting from those evaluations. The dispositional order further required Shavers to participate in family preservation services and to engage a public health nurse if T.S. were placed with him. To facilitate his compliance with the dispositional order, social workers employed by the Department of Social and Health Services referred Shavers for services. Social workers sent letters to Shavers on several occasions explaining the court-

ordered requirements and at least one social worker spoke with Shavers by telephone. Nevertheless, Shavers took no steps toward compliance with the dispositional order.

During the dependency, T.S. was placed in seven different homes, consisting of four relative placements and three foster care placements. A number of dependency review and permanency planning hearings took place between 2012 and 2015. Although counsel appeared on his behalf, Shavers did not personally attend any of these hearings. The court repeatedly found that Shavers was not visiting T.S., was not participating in the dependency, and was not engaging in any services offered by the Department.

T.S. was twice temporarily returned to the care of her mother. She was removed from the custody of her mother for the last time in September 2014. Shavers participated in that 2014 hearing by telephone. T.S. and one of her brothers remained together throughout the dependency. Shavers was not aware of all of T.S.'s placements nor was he aware that she had been placed with any foster families. Shavers had minimal contact with the Department, his whereabouts were frequently unknown, and he did not request visitation through the Department.

In the spring of 2015, Shavers began to have contact with T.S. He arranged visits directly with T.S.'s caretaker, and neither the court appointed special advocate nor any of the social workers assigned to the case were able to observe Shavers interact with T.S. According to Shavers, he visited T.S. approximately once a month.

The Department filed a petition to terminate the parental rights of both parents in May 2015. A few weeks before the January 2016 trial, T.S.'s mother relinquished her parental rights.

T.S. was almost five years old at the time of trial. She had made developmental strides over the previous two and a half years while attending a therapeutic preschool program at Childhaven. She had also benefitted from mental health counselling following a diagnosis of posttraumatic stress disorder. T.S. has sickle cell trait, which requires frequent monitoring. There were treatment meetings at Childhaven every three months to assess T.S.'s progress. Shavers attended one such meeting around August 2015. Childhaven staff invited Shavers to return to visit with T.S. at Childhaven, but he declined and was "not interested" because the facility reminded him of a jail on account of its locked doors and outside bars. Shavers did not feel T.S. needed to be in that program. Shavers also believed that T.S. did not need counseling.

Although the trial was continued twice to allow Shavers time to address his outstanding warrants, at the time of trial in January 2016, Shavers still had warrants for a 2013 charge of driving under the influence and domestic violence charges. Shavers claimed the domestic violence charges were based on a false report made by his current girlfriend. He did not appear in person at trial. He was allowed to participate by telephone.

Just days before trial, Shavers, his girlfriend, and their two children had moved to Shavers' aunt's home because of financial difficulties. He said they did not intend to remain at his aunt's home for long and planned to relocate as soon

-4-

as they could afford to do so. Shavers testified that he had at least nine biological children. He had never been employed outside of prison.

Shavers explained that he had not been involved in the dependency case because he "imagined" that the dependency was T.S.'s mother's "issue" and he thought that T.S. would be returned to her care. Shavers said it was not until the Department filed the petition for termination that he realized T.S. might not be reunited with her mother and also learned that he was required to participate in services. He testified that around the same time, he heard that a new social worker was assigned to the case and because he thought it would be best to speak to the new social worker, he took no action. He acknowledged that he "could have done a lot more" during the dependency. Shavers insisted that he was now ready, willing, and able to engage in services but also said that participation would be difficult because he took care of two of his children during the day while his girlfriend worked. He said he would "love more than anything" for T.S. to live with him eventually, once his family obtained "stable housing."

Shavers and three of his family members testified that he and T.S. shared a strong bond and that T.S. had frequent contact with Shavers and his extended family. However, according to other witnesses, T.S. was attached to her brothers and her mother but had spent little time with Shavers and did not really know him. Shavers was uncertain of when he had last seen T.S. He said he saw her in December 2015 but also admitted that it could have been earlier.

The court found that the Department proved the elements of RCW 13.34.180(1), concluded that Shavers was currently unfit to parent T.S., and entered an order terminating his parental rights. He appeals.

ANALYSIS

Parents have fundamental liberty and privacy interests in the care and custody of their children. In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298, review denied, 127 Wn.2d 1025 (1995). Terminating parental rights should be allowed only "'for the most powerful reasons'." A.J.R., 78 Wn. App. at 229 (internal quotation marks omitted), quoting In re Welfare of Sego, 82 Wn.2d 736, 738, 513 P.2d 831 (1973).

Washington courts use a two-step process when deciding whether to terminate parental rights. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190. Under the first step, the statutory requirements that the Department must prove by clear, cogent, and convincing evidence are set forth in RCW 13.34.180(1):

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>
>             . . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

Second, the juvenile court must consider whether, under a preponderance of the evidence standard, terminating parental rights is in the best interest of the child. RCW 13.34.190(1)(b).

Evidence is clear, cogent, and convincing if it shows the ultimate fact at issue is highly probable. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). On review, the juvenile court's findings will not be overturned if supported by substantial evidence. K.S.C., 137 Wn.2d at 925. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the declared premise. In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006). This court does not make credibility determinations or weigh evidence on review. C.B., 134 Wn. App. at 953. "The trial judge has the advantage of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." K.S.C., 137 Wn.2d at 925.

Likelihood of Remediation and Current Unfitness

Shavers contends that substantial evidence does not support the court's findings that he was currently unfit to parent T.S. and there was little likelihood that conditions could be remedied in the near future.

To meet its burden to prove current unfitness in a termination proceeding, the Department must prove that the parent's deficiencies prevent the parent from providing the child with basic nurture, health, or safety. In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014). The focus of RCW 13.34.180(e) is

-7-

whether identified deficiencies have been corrected. In re Welfare of M.R.H.,

145 Wn. App. 10, 25, 188 P.3d 510, review denied, 165 Wn.2d 1009 (2008), cert.

denied, 556 U.S. 1158 (2009). The failure to substantially improve parental

deficiencies within 12 months following entry of the dispositional order gives rise

to a rebuttable presumption that there is little likelihood that conditions will be

remedied so that the child can be returned to the parent in the near future. RCW

13.34.180(1)(e). A parent's unwillingness to avail himself of remedial services

within a reasonable period is "highly relevant" to the court's determination as to

whether the Department has satisfied RCW 13.34.180(1)(e). In re Welfare of

T.B., 150 Wn. App. 599, 608, 209 P.3d 497 (2009). Even if evidence shows the

parent may eventually be capable of correcting his or her deficiencies,

termination is still appropriate where the correction will not likely occur within the

foreseeable future. In re Welfare of A.G., 155 Wn. App. 578, 590, 229 P.3d 953

(2010), reversed on other grounds on remand, 160 Wn. App. 841, 248 P.3d 611

(2011).

Shavers claims there was no evidence that he has a current substance

abuse problem, lacks adequate parenting skills, or has untreated mental health

issues. But his illegal drug use and lack of involvement in parenting T.S. were

established as parental deficiencies. He agreed to the facts underlying these

deficiencies for purposes of the dependency. The Department was not required

to reprove these facts in the termination proceeding. In re Dependency of K.R.,

128 Wn.2d 129, 141-42, 904 P.2d 1132 (1995).

In the dispositional order, Shavers agreed to address substance abuse and his absence from T.S.'s life by participating in urinalysis testing and obtaining substance abuse and parenting evaluations. The agreed order provided that the Department would consider an omitted urinalysis to be a positive result. It is undisputed that more than three and a half years later, Shavers had not obtained either evaluation or submitted to urinalysis testing. Although Shavers testified at trial that he fully intended to engage in all required services if the court would allow him additional time, the court was not compelled to accept that testimony. Given the "history of the dependency," the court determined it was unlikely that Shavers would, in fact, follow through. This finding is supported by evidence Shavers had previously expressed a willingness to participate in the dependency and engage in services, but then failed to do so without explanation. The court did not unlawfully shift the burden of proof by considering Shavers' inaction throughout the dependency as evidence that the issues identified at the time of the dependency remained unresolved.

Contrary to the court's explicit finding, Shavers claims the evidence unequivocally demonstrates his parental fitness because he is the primary caretaker of two of his other children. A parent "has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child." A.B., 168 Wn.2d at 918. This inquiry is not limited solely to consideration of the parent's deficiencies. In re Parental Rights of K.M.M., __ Wn.2d __, 379 P.3d 75, 88 (2016). The court must consider

-9-

whether a parent is capable of parenting the particular child given the child's specific needs. K.M.M., 379 P.3d at 88.

Shavers relies on In re Interest of S.G., 140 Wn. App. 461, 469, 166 P.3d 802 (2007), to argue that the court terminated his parental rights based solely on evidence that he failed to participate in services. In S.G., the trial court expressly concluded that the father had no parental deficiencies and that services were ordered only to determine if any problems existed. S.G., 140 Wn. App. at 468-69. On appeal, the court held that a parent cannot be denied the right to parent his child "on the off chance that he may have a problem unknown to the State." S.G., 140 Wn. App. at 469.

In contrast, here, the court identified parental deficiencies and Shavers agreed to the underlying facts establishing those deficiencies. The juvenile court found that Shavers was currently unfit to parent based on his failure to address those deficiencies, his ambivalence toward being a full-time parent to T.S., and his failure to appreciate and prioritize her needs. Specifically, the court found:

> The child's father is currently unfit to parent this child. This is exhibited by his residential instability and his failure to support his eight (8) other children. The tone of Mr. Shavers testimony on January 26, 2016 is concerning in that it was rambling, rapid and at times incomprehensible. [T.S.] is treated for [posttraumatic stress disorder] at Childhaven. Mr. Shavers expressed resistance to this treatment and belief that [T.S.] would not have issues if she were in his home. Mr. Shavers has demonstrated that he puts his own interests before those of [T.S.]. He has demonstrated this by not clearing up three-year old warrants so that he could appear in person for trial and failing to participate in her therapy at Childhaven, among other concerns.

The court further found that Shavers had only "intermittent" contact with T.S., never set up a regular visitation schedule with the Department, had active warrants, and took no steps to engage in services or to "otherwise pursue custody" of T.S.

There was evidence and testimony that Shavers was "very much absent" from T.S.'s life. Shavers only began seeing T.S. regularly in 2015, when she was four years old, and he was no longer doing so by the time of trial. Shavers' testimony reflected his lack of awareness of the details of T.S.'s life. Although Shavers now claims that he pursued custody by expressing interest in placement to one social worker and obtaining a reference for a provider at some point, the evidence, including Shavers' own testimony, supports the court's finding that he did not participate in the dependency process and took no significant action in over three years to gain custody.

Shavers also claims that the court's finding of "residential instability" is unwarranted because there was no evidence to suggest he was not welcome to stay with his aunt for as long as he wished. But again, Shavers' own testimony supports the finding that his current housing situation was temporary and his future housing circumstances were uncertain. Shavers expressly testified that placing T.S. in his care while he was living at his aunt's home would not be ideal, but he hoped she could "eventually" live with him once he secured new housing.

Shavers also disputes the court's determination that his inaction on his outstanding warrants reflects a failure to prioritize T.S. Shavers testified that he failed to address the warrants because of scarce financial resources and his

current caretaking responsibilities. But Shavers' explanation does not fully explain his failure to take action since he had several years to act on the warrants. The evidence supports the inference drawn by the court.

In spite of evidence that both counselling and therapeutic day care were beneficial to T.S., Shavers did not appear to understand the reasons why T.S. was engaged in these services or support her participation. Shavers points out that when directly asked, he said he would allow T.S. to continue attending the Childhaven program. But he fails to acknowledge that he remained equivocal about the issue, stating that he "didn't like what [he] saw" at Childhaven, suggested it was inappropriate for experts to "dissect" and diagnose T.S., and continued to profess that being placed with family would resolve any issues T.S. had.

Although the court described Shavers' rambling and sometimes incoherent testimony as "concerning," the court did not find that he had a mental health disorder or connect the finding about the "tone" of his testimony to a determination of unfitness or a parental deficiency. As the court explained in its oral ruling, the issue of Shavers' presentation was relevant to the estimate of the amount of time it would take for Shavers to fulfill the requirements of the dispositional order. Shavers argued that it would be possible to complete evaluations within 30 days and that, considering evidence that he is a capable parent to other children, he "might not need any kind of follow through" as a result of a parenting assessment. Based on Shavers' testimony and demeanor, the court disagreed, observing that an evaluation would likely lead to a

-12-

recommendation for mental health treatment. The court found that even if Shavers immediately began to comply with the dispositional order, it was reasonable to assume that it would take a minimum of 6 months to fulfill the requirements. Ultimately, without evaluations, the court determined that there was "no way to know" whether a 6-month estimate was accurate or if more time would be required for Shavers to show progress in correcting his deficiencies. The court determined that even if 6 months was sufficient, this length of time was not within the foreseeable future for T.S.

Shavers had completed no services directed toward addressing his parental deficiencies and made no progress toward unification in almost four years since T.S. was first removed from her mother's care. Accordingly, substantial evidence in the record supports the court's findings that Shavers was currently unfit to parent T.S. and there was little likelihood that conditions would be remedied so that T.S. could be placed in his care in the near future.

Diminished Prospects

Shavers challenges the court's finding that continuation of the parent-child relationship clearly diminished T.S.'s prospects for an early integration into a permanent and stable home. See RCW 13.34.180(f). He argues that, contrary to the court's finding, his home was stable and if placed with him, T.S. would benefit from connections to extended family. But the main focus of this factor is not the stability of the parent's home, but whether the parent-child relationship impedes the child's prospects for integration. K.S.C., 137 Wn.2d at 927.

Again, Shavers testified that his housing situation was unstable, which was why he asked the court to defer placing T.S. in his care. More importantly, it is undisputed that T.S. had been dependent for more than three and a half years and had never lived with Shavers. There was testimony that she was bonded to the caregivers in her current placement, was adoptable, and had prospects for adoption. The evidence amply supports the court's finding that continuation of the parent-child relationship impeded T.S.'s prospects for early integration into a stable and permanent home.

Notice

Shavers claims that the trial court violated his right to due process by terminating his parental rights, in part, based on unaddressed mental health issues, a deficiency of which he did not receive adequate notice before the fact-finding hearing.

Due process in the context of parental rights requires "'that parents receive notice of the specific issues to be considered'" at a termination hearing. In re Dependency of A.M.M., 182 Wn. App. 776, 791, 332 P.3d 500 (2014), quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970). Such notice is required "'to prevent surprise, helplessness and disadvantage.'" A.M.M., 182 Wn. App. at 791, quoting Martin, 3 Wn. App. at 410.

In A.M.M., the dependency proceedings and termination hearing focused on the mother's substance abuse problems. A.M.M., 182 Wn. App. at 780-83. But the court terminated her parental rights based on a separate parental deficiency, in addition to substance abuse, that was not stated in the termination

-14-

or dependency petition and of which she was not informed before trial. A.M.M., 182 Wn. App. at 792. This court reversed and remanded for the juvenile court to determine whether termination was appropriate on the basis of the parental deficiencies of which the mother was given adequate notice. A.M.M., 182 Wn. App. at 792-93.

As explained, the court in this case did not conclude that Shavers had a mental health disorder, nor base its termination ruling on any deficiency related to Shavers' mental health or his need for mental health treatment. Shavers was notified of the specific issues to be considered at the termination hearing, namely, his lack of consistent involvement in T.S.'s life and failure to take action toward correcting his parental deficiencies. While the mother in A.M.M. was unfairly surprised when she was made aware of a parental deficiency that could support termination only when a social worker testified about it at trial, Shavers was not unfairly disadvantaged here because the court evaluated his trial testimony. Shavers fails to establish a due process violation.

Affirmed.

Becker, J.

WE CONCUR:

Trickey, J