IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Welfare of | ) | |
| | ) | No. 40890-6-III |
| A.T. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

BIRK, J.[*] — K.T. appeals an order terminating her parental rights to her daughter A.T. K.T. argues that the Department of Children, Youth, and Families (DCYF) failed in several respects to provide "active efforts" to prevent the breakup of the family under the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, and the Washington State Indian Child Welfare Act (WICWA), ch. 13.38 RCW. *See* 25 U.S.C. § 1912(d), RCW 13.38.130(1). Although we reject the majority of K.T.'s arguments on appeal, we agree with K.T. that the evidence at the termination trial did not show that DCYF made active efforts in conducting a diligent search for A.T.'s extended family members in

---

[*] The Honorable Ian S. Birk is a Court of Appeals, Division One, judge sitting in Division Three pursuant to CAR 21(a).

support of a relative placement in reasonable proximity to K.T. in Washington. For this reason, we reverse the termination order and remand for further proceedings.

## BACKGROUND

On May 28, 2021, DCYF learned that K.T. had given birth to A.T. prematurely and that A.T. tested positive for methamphetamines and amphetamines. A.T. is an Indian child, as K.T. is an enrolled member of the Confederated Tribes of the Colville Reservation (Colville Tribe), and A.T.'s father, G.C., Jr., has Nez Perce ancestry. After a family team decision making meeting to discuss the family's needs and supports, DCYF filed a dependency petition regarding A.T. The petition, filed approximately one week after A.T.'s birth, identified concerns about K.T.'s substance use, her minimization of that use, and her untreated mental health needs. K.T. had a difficult childhood and was largely raised by her father, who had died on July 14, 2018. Witness testimony described animosity between K.T. and her mother, R.M.

### *Relative Placement*

When DCYF filed a dependency petition, K.T. had requested that A.T. be placed with R.M., who resided in Arizona. After a contested shelter care hearing, the court found that no relative placement or suitable alternative caregiver was available for A.T. and ordered placement in licensed foster care.

According to the June 10, 2021 shelter care order, the Colville Tribe was aware of

K.T.'s mother as a possible placement, while recognizing she lived in Arizona:

> The social worker has contacted the Tribe (Amber Toler) and they were invited to the FTDM [Family Team Decision Making meeting]. They are familiar with the family, as they have legal jurisdiction of [K.T.'s] oldest child, however they are not intervening at this time. They did not identify any placement preference, aside from the maternal grandmother, however she resides out of state and an ICPC [Interstate Compact on the Placement of Children, ch. 26.34 RCW,] would need to occur prior to placement. No other placement options were provided.

The order reflected DCYF's effort at that time to locate other relatives of A.T.:

> Held an FTDM with the mother and tribe. Placement was discussed, two relatives' maternal aunt and grandmother live in Arizona but an ICPC would need to be completed, mother is not in support of this placement. Department completed a parent locator and relative search in ACES, FAMLINK.[1] Mother provided a new name for a relative [M.T.] on 6/7/21. Department has tried calling but have not heard back whether the relative is willing to take placement. Calls were also made to the alleged father's relatives with no response. Suitable other, who has placement of half-sibling [A.S.[2]] was also contacted and indicated she was unable to take placement.

Our record does not make further reference to M.T.

Social Worker Jocelyn Siefert testified to DCYF's relative search, though she was

not the one who performed the search:

> Q      Okay. Did you do a relative search for any family members for [A.T.]?
> A      Yes. Those results were on the court report, too.

---

[1] ACES and FamLink are case management systems used by DCYF.

[2] A.S.—K.T.'s son and A.T.'s half-sibling—was placed with S.T. and later was placed with K.T.'s bother.

Q       Okay.  What were the results?
A       There were three that I can think of interested.  I have a court report. Would you like me to look?
Q       Would that refresh your recollection?
A       Yes.
               [DCYF COUNSEL]: If the Court doesn't mind?
               THE COURT: Yes, you may.
               THE WITNESS: So we got three responses of interested.
       One of them was [R.M.], and then the other two were from a [R.T.], and one response said that he was actually deceased.
Q       (By [DCYF COUNSEL]) Okay.  How many relative searches did you do?
A       I'm not entirely sure.  I do believe if you want me to look at another court report because the results are on the court report, and they're in realtime and can change.
Q       Would that refresh your recollection?
A       Yes.
               [DCYF COUNSEL]: Your Honor, if you don't mind?
               THE COURT: I'm fine if it helps you refresh your memory.
               THE WITNESS: So the court reports that I looked at again
       list [R.M.], two responses for [R.T.] and then there is [S.T.] was, also, listed on the Court report.[3]
Q       (By [DCYF COUNSEL]) So it's an ongoing search, right?
A       Yes.
Q       Did you send out letters multiple times or?
A       We have a relative search unit.  So I didn't actually physically do this.

In June 2021, K.T. completed a chemical dependency assessment at the American Indian Community Center (AICC), which recommended treatment.  DCYF agreed that intensive outpatient treatment at Rising Strong, a residential program that provides both mental health and chemical dependency services, would benefit K.T.  She entered Rising

___

[3] The S.T. that Siefert named in her testimony at the termination trial was a different name from the S.T. named in the June 10 2021 shelter care order with whom K.T.'s son A.S. was placed.

Strong on June 28, 2021. Because A.T. was still hospitalized, DCYF worked with hospital staff to adjust visitation hours so K.T. could see A.T. while participating in services at Rising Strong. Some testimony indicated K.T. consistently attended visitation while A.T. was in the hospital. Rising Strong transported K.T. to the hospital for visitation.

In August 2021, the court entered an agreed order of dependency. The order continued A.T.'s out-of-home placement in licensed foster care. In a September 2021 review order, the court indicated that K.T. was regularly visiting A.T. in the foster placement.

On December 14, 2021, by agreed order, A.T. was placed with R.M. in Phoenix, Arizona. Although R.M. was not a member of the Colville Tribe, she had previously lived on the reservation and had ties to the community through her children, who are members. The court found the placement complied with ICWA preferences. According to its qualified expert witness, the Colville Tribe raised no objection to A.T.'s placement outside of Washington.

In November 2022, DCYF assigned the case to Social Worker Marlene Sproul. Sproul, an expert in ICWA cases and a Coeur d'Alene Tribe member and elder, met with K.T. even before the formal transfer of the case to discuss available services. Throughout her time working with K.T., Sproul discussed potential relative placements nearer to K.T.'s residence, but K.T. never identified any options. Sproul testified she "talked with

[K.T.] many times about is there any other person in the family that you consider family, a relative or anybody that could take [A.T.] over here and have placement," but there was not anybody that K.T. could identify. Sproul did not believe a relative search was done while she was assigned to the case.

Another social worker assigned to the case in 2023, Katie Hollingsworth, testified that because the placement was "safe and stable," it was not a priority to disrupt it. Consistent with the DCYF social workers generally relying on the relative search unit, Hollingsworth also explained that she personally did not do a relative search or contact paternal family members. Social Worker Paige Braman was assigned in October 2023 and testified the placement was stable, she did not look into other relatives, and K.T. did not propose other relative placements.

At trial in fall 2024, K.T. testified that her family is large and resides mostly in eastern and central Washington. She said that she did not seek to remove A.T. from placement with R.M. in Arizona because her lawyer at the time said there was not another relative placement. But K.T. doubted the truth of this, explaining she did not know why there was not a relative placement "because I have a really large family." When asked if she discussed this with DCYF, she testified her uncle M.M. had told her that DCYF sent him paperwork in the mail and that his wife would take A.T., but he never heard back. K.T. called as a witness her stepmother J.M.T., who testified the extended family is very large. J.M.T. testified she had not had contact from DCYF about

6

A.T.  K.T. also called as a witness K.R.  K.R. testified that she and K.T. have a large family, with "probably over 250 first cousins."  K.R. testified she had been a relative placement for one of her and K.T.'s "mutual relatives," and that in 2020 K.R. had applied to be a foster parent "for all Native kids."  However, K.R. testified she had not ever had contact with DCYF about K.T.

K.T. called Qualified Expert Witness Theresa Thin Elk.  Thin Elk testified that one of the "red flags" she saw was the fact the child was placed out-of-state, even though there were many family members in Washington, and the out-of-state placement would make it difficult for a parent to reunify.  Thin Elk testified that she saw in the case notes unsuccessful efforts to contact relatives G.C. and his wife.  In rebuttal, DCYF called Social Worker Braman, who testified that K.T.'s relatives who testified at trial did not come up in a relative search for DCYF and that K.T. did not bring them to Braman's knowledge.

*Visitation*

When the court ordered placement in Arizona, it ordered that visitation between K.T. and A.T. occur in person, supervised, for a minimum of two nights twice per month.  DCYF agreed to provide transportation and lodging assistance to facilitate visitation.  DCYF attempted to arrange in-person visits through an agency in Arizona and gave K.T. weekly updates on its efforts.  Social Worker Seifert made referrals to several visitation agencies, but some did not meet insurance requirements for transportation, and another

7

declined due to the family's extensive case file. DCYF referred the family for virtual

visitation to support contact, but K.T. declined, saying she was maintaining contact with

A.T. through R.M.

DCYF also asked R.M. to supervise in-person visits, but she was not comfortable

doing so. K.T.'s sister, M.W., who lived in Arizona, was likewise unavailable to

supervise. By March 2022, DCYF was close to finalizing a contract with a visitation

agency, though services were not yet in place. To reduce barriers, DCYF and the

provider structured visitation to take place in a hotel room, allowing K.T. to take a shuttle

directly from the airport to the visitation location. Also in March 2022, M.W. purchased

a bus ticket for K.T. to travel to Arizona. When DCYF learned of K.T.'s travel plan, it

asked the visitation provider to expedite arrangements to accommodate her plans, and the

provider was able to accommodate the last minute visit.

When R.M. learned that K.T. was going to travel to Arizona, she contacted DCYF

with concerns about prior domestic violence charges arising from an incident in which

K.T. allegedly grabbed a phone from R.M. as she tried to call law enforcement during a

dispute. Seifert coordinated with her Arizona counterpart and persuaded R.M. not to

include A.T. as a protected party on the temporary restraining order she intended to seek

against K.T., so as not to interfere with parent-child contact.[4]

---

[4] K.T. argues that Siefert "encouraged" R.M. to obtain a restraining order. Siefert was asked on cross-examination to agree with that characterization, but she did not do so. Siefert testified that she gave R.M. "the advice that was offered to me," which was to

During the trip to Arizona, K.T. was involved in a physical altercation with her sister and her mother, R.M. Following the incident, she took her sister's car and left. K.T. was subsequently arrested, taken into custody, and charged with offenses stemming from the alleged assault and car theft. After her release from jail, she returned to Washington. When she later failed to appear for a hearing on the criminal charges, the Arizona court issued a warrant for her arrest.

In May 2022, K.T. was incarcerated in Stevens County and later transferred to Lincoln County Jail, where she remained until October 2022. During this time, the dependency court suspended in-person visitation, citing safety concerns tied to K.T.'s Arizona criminal charges and her incarceration. The court instead authorized virtual or telephonic visits, to be supervised by R.M. if she was willing to facilitate. In September 2022, R.M. brought A.T. to visit K.T. at the jail. Following her release, K.T. had regular video visits with A.T.

K.T. was again incarcerated at the Spokane County Jail in late December 2022. In a dependency review hearing order entered on December 23, 2022, the court noted that visitation was not court ordered while K.T. remained in custody. Nevertheless, DCYF agreed to facilitate virtual visits during her incarceration and to coordinate virtual visits

---

request the restraining order. Thus, while the record supports that Siefert conveyed that advice to K.T., it does not reflect that DCYF was predisposed one way or the other as to whether R.M. should pursue an order.

upon her release. DCYF also agreed that K.T. and A.T. would have an in-person visit when R.M. and A.T. traveled to Spokane. When R.M. brought A.T. to Spokane in late December, Sproul secured a court order for a one-time visit. Despite limited agency availability during the holiday season, DCYF found services willing to supervise the one-time visit, but K.T. was then in Spokane County Jail, which prevented the visit from occurring.

In June 2023, R.M. and A.T. traveled to the Spokane area, where K.T. had three in-person visits with A.T. over a three-day period. The first two visits were between only mother and child, and two of A.T.'s siblings joined during the third visit. During this time, Hollingsworth worked extensively with K.T. to address her outstanding warrants in Arizona so she could resume in-person visitation there. She contacted the Arizona court to determine whether K.T. could appear virtually, but the court denied the request. Hollingsworth then offered K.T. airline transportation, meal allowances, and lodging to facilitate travel to Arizona and clear the warrant. K.T. refused, stating she did not wish to turn herself in.

In October 2023, A.T. and K.T. had an in-person visit in Washington that lasted approximately six hours. When K.T. missed scheduled visitation sessions, DCYF arranged make-up virtual visits in January 2024, but K.T. declined virtual visits on at least some occasions. Social worker Braman arranged for virtual visitation in February 2024, but K.T. did not respond to the agency's outreach. A.T.'s ability to travel to

10

Washington for visitation was restricted due to a condition with her ears.  DCYF

continued to make referrals for virtual visits.  The Colville Tribe approved of A.T.'s

placement with R.M. in Arizona.

*Services*

In the June 10, 2021 shelter care order, the court directed K.T. to complete a

chemical dependency assessment, submit to random urinalysis testing (UA), and engage

in mental health treatment or individual counseling, with a requirement to comply with

any provider recommendations.

While at Rising Strong, K.T. submitted to some UA testing and completed a

mental health assessment, but did not participate in parenting or mental health services

and did not complete chemical dependency treatment.  She left the program on July 14,

2021, after a little more than two weeks.

Under the August 2021 agreed order of dependency, K.T. agreed to complete a

chemical dependency assessment, follow through with any recommended treatment, and

submit to random UA/BA (breath analysis) testing.  The court also directed K.T. to

complete a mental health assessment, engage in any recommended treatment, and

complete a parenting assessment.

Seifert assisted K.T. in seeking inpatient treatment at Spokane Addiction Recovery

Centers (SPARC) and scheduled a bed date for August 2021, which was rescheduled

after K.T. failed to appear.  Seifert next arranged for K.T. to enter inpatient chemical

11

dependency treatment at the Northwest Indian Treatment Center in Elma, Washington, with a bed date of August 23, 2021. Because K.T. did not want Seifert to transport her, DCYF provided gas cards so a friend could drive her. K.T. briefly checked into the facility but left two days later. K.T. was incarcerated in the Spokane County Jail in approximately October or November 2021. Seifert offered transportation from the jail to SPARC upon K.T.'s release.

After K.T. was released from jail in November 2021, DCYF arranged for her to complete a chemical dependency assessment at SPARC. The assessment diagnosed her with alcohol use disorder, stimulant use disorder, and cannabis use disorder. Inpatient substance abuse treatment was recommended. K.T. briefly entered treatment in late November 2021 but was discharged in less than a week for refusing to leave her bed and for being disrespectful to staff.

In the fall of 2021, when A.T. was about six months old, K.T. completed a parenting assessment with Caitlyn Soriano, a licensed mental health counselor. Soriano observed positive interaction between mother and daughter. She noted limited eye contact, which indicated a need for bonding services. Soriano concluded that strengthening the relationship would require consistent visitation, participation in mental health treatment, and participation in an evidence-based parenting program. She recommended Promoting First Relationships, an evidence-based program. She further

observed that K.T.'s substance use would significantly affect her ability to establish a consistent bond with A.T.

When K.T. expressed interest in pursuing an online chemical dependency treatment program, Seifert explored whether the service was viable and could satisfy K.T.'s recommended treatment needs. She also provided K.T. with information about non-contracted treatment providers. Seifert included the Colville Tribe in case planning and encouraged its participation in four shared planning meetings to collaboratively address K.T.'s needs and barriers to services. Recognizing K.T.'s history of trauma and dysfunctional family relationships, Seifert also offered counseling to address those issues.

When K.T. was released from jail in October 2022, Sproul provided her a gas card to enable her to meet with a chemical dependency and mental health provider that K.T. had identified. On November 1, Sproul administered an oral swab, which tested positive for methamphetamine and amphetamine. Sproul discussed the AICC chemical dependency assessment with her and made a referral for mental health services at Phoenix Counseling. K.T. engaged in counseling sessions but struggled to maintain progress after her assigned counselor, Jamie Bull, left the agency. In May 2023, K.T. completed an updated chemical dependency assessment at AICC. Sproul emphasized regular communication and provided positive affirmation when K.T. engaged in services. She also offered practical support, including gas cards, rides to and from services, and enrollment in parenting classes at Vanessa Behan Crisis Nursery, which offered childcare

for K.T.'s other two children. K.T. missed her first scheduled class without explanation and was discharged.

After K.T. completed a chemical dependency assessment at the AICC, she was scheduled to begin intensive outpatient treatment in July 2023. K.T. was discharged from the intensive outpatient program due to sporadic attendance. She was also discharged from mental health counseling at Phoenix for lack of engagement and attendance. Hollingsworth later referred K.T. for a UA, but K.T. did not comply.

In January 2024, the dependency court found that K.T. had failed to make progress in court-ordered services despite DCYF's active efforts to support her. The court directed DCYF to file a petition to terminate K.T.'s parental rights. Nevertheless, DCYF continued to encourage K.T. to participate in services, though she declined to do so.

At trial, K.T. disputed the positive UA test results obtained during the dependency proceedings. She further testified that she did not complete parenting classes, mental health treatment, or chemical dependency treatment because she did not want to and did not believe such services were necessary.

The trial court entered an order terminating K.T.'s parental rights on December 19, 2024. The court found that DCYF had made active efforts, that there was little likelihood the conditions would be remedied in the near future, and that A.T. would face

serious physical or emotional harm if returned to K.T.'s custody. The court entered an

unchallenged finding of fact documenting K.T.'s substance use and its risk to A.T.:

> [K.T.] has also used illicit substances consistently throughout the dependency, rendering her incapable of properly caring for [A.T.] for the last three years. Her use was proven at trial based upon her positive UA and oral swab testing, the tests she failed to appear for, and her admissions during her testimony, including the admission that she used urine she purchased for one of her positive UA results. [A.T.] is very young, she was removed at birth and is now three years old. [K.T.'s] untreated substance use poses a risk of harm to [A.T.]. During trial, [K.T.] confirmed that she would not be engaging in any substance abuse treatment or substance use testing in the future because she does not believe that she needs treatment.

K.T. appeals.

## ANALYSIS

When seeking termination of parental rights, DCYF must first prove the six

statutory elements outlined in RCW 13.34.180(1) by clear, cogent, and convincing

evidence. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020);

RCW 13.34.190(1)(a)(i). Once that burden is met, DCYF must then show that

termination is in the child's best interests by a preponderance of the evidence. RCW

13.34.190(1)(b); *In re Welfare of A.J.R.*, 78 Wn. App. 222, 228, 896 P.2d 1298 (1995).

ICWA and WICWA require DCYF to show "that active efforts have been made to

provide remedial services and rehabilitative programs designed to prevent the breakup of

the Indian family and that these efforts have proved unsuccessful." RCW 13.38.130(1);

25 U.S.C. § 1912(d). The " 'active efforts' " mandate is more demanding than the

" 'reasonable efforts' " standard applied in non-ICWA/WICWA cases and requires a

"higher level of engagement." *In re Dependency of G.J.A.*, 197 Wn.2d 868, 875, 489
P.3d 631 (2021). ICWA and WICWA do not permit the application of the futility
doctrine. *Id.* DCYF has the burden to provide active efforts, and it also has the burden to
prove that those efforts were in fact unsuccessful before the matter can proceed to
termination. *Id.* at 875-76. A parent's action, inconsistency, or inaction does not excuse
DCYF from providing active efforts. *Id.* at 876. Active efforts must be specifically
tailored to the facts and circumstances of the case, and DCYF must act diligently to
address a parent's particular needs. *Id*. at 892 (citing 25 C.F.R. § 23.2). On appeal, the
issue of whether DCYF has satisfied the active efforts requirement is a mixed question of
law and fact. *Id*. at 887. This court reviews the trial court's findings of fact for
substantial evidence, but it reviews the legal question of whether DCYF made active
efforts in compliance with ICWA and WICWA de novo.[5] *Id*.

*Active Efforts Toward A Relative Placement*

K.T. first argues that the evidence at trial did not show that DCYF made active
efforts to investigate a relative placement other than with K.T.'s mother in Arizona, with

---

[5] In several instances, K.T. does not explain why challenged factual findings lack
substantial evidentiary support. Ordinarily, we will not consider assignments of error that
are unsupported by argument or citation to the record. *Seattle Sch. Dist. No. 1 v. State*,
90 Wn.2d 476, 496, 585 P.2d 71 (1978); RAP 10.3(a)(6). Nonetheless, because courts
have a special duty to ensure compliance with ICWA and WICWA, and because we can
discern specific arguments challenging the factual findings, we generally deem K.T.'s
appellate arguments to be properly before us and reach their merits. *See e.g. In re
Dependency of R.D.*, 27 Wn. App. 2d 219, 233, 532 P.3d 201 (2023).

whom K.T. had a strained relationship, and in Washington where regular visitation could occur. We agree.

ICWA defines "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. Active efforts are to be "tailored to the facts and circumstances of the case" and "may include," id., in relevant part, "[c]onducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents." 25 C.F.R. § 23.2(4); *see also* RCW 13.38.180(1)(a), (c) ("When an emergency removal, foster care placement, or preadoptive placement of an Indian child is necessary, a good faith effort will be made to place the Indian child: (a) In the least restrictive setting; . . . (c) Which is in reasonable proximity to the Indian child's home.").

The evidence at trial showed that A.T.'s placement in Arizona created a barrier to maintaining K.T.'s relationship with her, because of the difficulty of long-distance visitation. Social worker Sproul and K.T.'s expert witness, testified to the challenge of A.T.'s placement in Arizona. We do not understand DCYF to dispute this, and it argues it "actively encouraged K.T.'s visitation with A.T. throughout the proceeding," it worked to "remove any barriers to K.T.'s transportation," and when in-person visitation proved difficult, the social workers "continually ensured that K.T. and A.T. could interact

through virtual visits," DCYF argues it "made thorough, timely, and ongoing efforts to encourage familiar contact, in-person and virtually, to support possible reunification." Given the limitations of the Arizona placement, this was a case in which, to be tailored to the facts and circumstances of the case, active efforts needed to include a diligent search for A.T.'s family members in case a local Washington placement nearer to K.T. was available.

While DCYF appeared to do what circumstances permitted to facilitate visitation while A.T. was placed in Arizona, DCYF is able to point to little in the record in support of its efforts to locate possible nearer relative placements. It begins by pointing out that, at least at one point, K.T. agreed to A.T.'s placement in Arizona and that the placement met the preference requirements of ICWA. Then, it notes the Colville Tribe supported A.T.'s placement with R.M. But these circumstances do not speak to DCYF's efforts to search for, identify, and contact A.T.'s extended family members, including those who may have resided in Washington.

As to these efforts, the record shows that, at the start of the dependency, DCYF performed a search that resulted in at least three possible contacts, one of whom was R.M. in Arizona. And, the record shows that DCYF social workers asked K.T. if she could identify potential nearer relative placements, and she did not. But because the social workers who testified at trial did not perform the search, they were not able to describe what the search entailed. They also did not conduct subsequent searches as they

were assigned during the dependency.[6]  The result is that the court cannot know what

DCYF did or did not do to search for A.T.'s relatives, nor assess its thoroughness in light

of both the family's circumstances and the requirements of ICWA and WICWA.

In the absence of a fuller record, we cannot say whether DCYF made active efforts

to search for A.T.'s extended family members.  DCYF put on no evidence showing what

it did to attempt to search for A.T.'s family members.  The evidence supports that DCYF

performed one relative search at the start of the dependency, with the results of the search

reflected in the June 9, 2021 shelter care order, and also, appropriately, asked K.T. for

possible relative placements.  But the record does not allow us to know what went into

the original search, and it was never revisited.  Under ICWA and WICWA, DCYF "must

also be consistent in its provision of active efforts throughout the dependency, and it is

not relieved of its duty to provide active efforts simply because it made sufficient efforts

at another time during the dependency."  *G.J.A.*, 197 Wn.2d at 892.  With the nearest

placement in Arizona, it was critical in this case for DCYF to make a fulsome search for

---

[6] We do not mean to suggest that it was the social workers' individual responsibility to do so.  We simply point out that because they were not the ones who performed or appeared to be responsible to perform the relative search, they could not say what was done or not done, and as a result, the court lacks that record.  Our reversal in this case is based on the lack of evidence of efforts by DCYF apart from the work that the social workers undertook directly with K.T.  Our opinion should not be taken as a criticism of their work on this case.

A.T.'s extended family in the local area. Since there was no evidence of what went into DCYF's relative search, we cannot say DCYF made active efforts in performing it.

In connection with the relative search, K.T. challenges two findings of fact, in which the court found K.T. agreed to the placement with R.M., later changed her mind, did not have a suggestion for an alternative placement, the Colville Tribe approved the placement, DCYF knew the placement complied with ICWA placement preferences, and DCYF intended to provide visitation. These findings are generally supported by the evidence described above, but they do not address the initial question of what DCYF did to try to locate A.T.'s extended family. Thus, even though we uphold the challenged findings, the absence of evidence on DCYF's initial and only relative search prevents a conclusion that it made active efforts on that issue. This requires that we reverse the termination order.

*Active Efforts Regarding "Disconnect" with Services*

K.T. argues that DCYF inappropriately failed to determine whether K.T. had cognitive limitations requiring accommodations in services. We disagree.

K.T. focuses on testimony by social worker Siefert that DCYF "would have liked to have had a psychological evaluation," but relied on mental health treatment to make that recommendation, recognizing a psychological evaluation was not a court-ordered service. When asked to describe K.T.'s parental deficiencies or barriers to being able to safely parent, Siefert said, "Primarily it was the substance use and then the disconnect

between . . . what was happening in terms of what we were experiencing and what was happening in terms of what [K.T.] was experiencing, so untreated mental health." Siefert summarized, "It was primarily the chemical dependency and the mental health." Siefert testified that DCYF requested a psychological evaluation in connection with the shelter care order, "but it wasn't agreed to."

On appeal, K.T. characterizes this testimony as showing a failure to make active efforts to provide a psychological evaluation or to investigate "cognitive differences" that might "explain" the "disconnect" Siefert described. Where DCYF has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to ascertain the extent of the disability and how it could interfere with the parent's ability to understand and benefit from DCYF's offer of services. In re Parental Rights to M.A.S.C., 197 Wn.2d 685, 699, 486 P.3d 886 (2021). If reasonable efforts reveal that the parent does have an intellectual disability, then DCYF must tailor its offer of services to ensure that the offer is reasonably understandable to the parent.[7] *Id*.

Unlike M.A.S.C., in this case there was not evidence that K.T. had an intellectual disability interfering with her ability to understand and benefit from DCYF's offer of services. To the contrary, K.T.'s therapist at the Ferry County Jail diagnosed only

---

[7] M.A.S.C. was not subject to ICWA and WICWA. Because we conclude that reason to suspect a cognitive impairment was not present here, we do not address how M.A.S.C. would apply in a case subject to ICWA and WICWA.

21

"unspecified anxiety." After conducting K.T.'s parenting assessment, Soriano did not make report of cognitive or developmental deficiencies. Instead, Soriano recommended family therapy as an option instead of an evidence-based parenting program and noted the effects of illicit substance use on the ability to safely parent A.T.

There is no evidence that a provider ever made a referral for a psychological evaluation nor that the court ever ordered one. In context Siefert's reference to a "disconnect" refers to K.T.'s untreated substance use and mental health, where K.T. endured both throughout the dependency yet denied that she needed treatment for either. DCYF did not fail to make active efforts in regard to potential cognitive or developmental delays.

*Active Efforts Regarding K.T.'s Relationship with R.M.*

K.T. argues that DCYF failed to provide services aimed at helping her build a functional relationship with her mother before placing A.T. out-of-state and then stood by as the relationship deteriorated to the point of undermining reunification efforts. We disagree.

K.T. contests the trial court's finding of fact 2.8.85, which states:

Ms. Sproul thought that family therapy might be helpful to the relationship between the maternal grandmother and [K.T.] in the future but that [K.T.] needed to address her own substance abuse and mental health issues first. Ms. Sproul attempted to help by speaking with the maternal grandmother about communicating with [K.T.] appropriately during virtual visits.

At trial, Siefert testified that she offered counseling to address K.T.'s history of trauma and dysfunctional family relationships. Seifert emphasized:

> We looked at relationships, and I mean, there didn't seem to be any relationships that weren't—I'm not sure the word I would use. I had previously used dysfunctional. Maybe I'll stick with that.

Sproul also recommended family therapy due to the strained relationship between K.T. and R.M., but described other issues at the "forefront." When asked about whether family therapy would be helpful, Sproul explained, "[Y]ou have somebody in Arizona and you've got everyone up here and there's other issues at the forefront that the family is working on, [R.M.]'s down there caring for [A.T.], and the mom is up here trying to work on chemical dependency, mental health, evidence-based parenting and all these other things." The Colville Tribe participated with DCYF to collaboratively address K.T.'s needs and barriers to services. And the only "red flags" raised by K.T.'s expert, Thin Elk, when reviewing the dependency proceedings were A.T.'s non-enrollment in the Colville Tribe and out-of-state placement. Substantial evidence supports the trial court's finding that DCYF was attentive to repairing the family relationships, but K.T.'s substance use and mental health needed to be addressed first. And, the record shows these actions constituted "active efforts" to procure "reasonably available and culturally appropriate preventive, remedial, or rehabilitative services." RCW 13.38.040(1)(a).

23

*Active Efforts to Assist Engagement with Counselor*

K.T. argues that DCYF failed to make active efforts to maintain K.T.'s relationship with a particular counselor after that counselor left the firm where he had been employed. We disagree.

K.T. challenges the following findings:

> 2.8.69 Marlene Sproul connected [K.T] to individual counselors that she believed would be a good fit for [K.T] but [K.T] did not agree to any suggested provider.
> . . . .
> 2.8.72 [K.T] attended nine counseling sessions with Phoenix starting on January 6, 2023. Ms. Sproul continued to encourage her to keep going. When [K.T]'s counselor changed in May 2023 she dropped out and refused to return to the agency. [K.T] reported to Ms. Sproul that she had a difficult time engaging with the new counselor.
>
> 2.8.73 Ms. Sproul testified that she reached out to [K.T] numerous times to encourage her to re-engage without success. She encouraged [K.T] to get a new assessment and encouraged her to reconnect with Shelley Etherington at AICC.

Trial evidence supported these findings. Sproul collaborated with the parties to support K.T.'s participation in mental health services at Rising Strong. In January 2023, K.T. engaged with Phoenix, where she did "really well" and completed some sessions. After her provider left Phoenix in May 2023, K.T. expressed dissatisfaction with her newly assigned provider. In response, Sproul encouraged her to continue working with the new provider. To support K.T.'s participation, Sproul provided transportation assistance, gas cards, and consistent encouragement. When K.T. discontinued counseling, Sproul discussed alternative treatment options with her.

DCYF's provision of mental health treatment amounted to "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2.

*Calling Four out of Eight Assigned Social Workers at Trial*

K.T. asserts that the trial court lacked adequate evidence that DCYF engaged in consistent and thorough active efforts throughout the dependency, because it called only four out of eight social workers who were periodically assigned during the dependency. However, K.T. devotes only one page of her brief to this argument, cites no authority, and states only in conclusory terms that there were allegedly unaccounted for "gaps of time" precluding a conclusion of active efforts. The testimony from the social workers, combined with evidence of K.T.'s known periods of incarceration, appeared to account for nearly the entire three-year dependency. The absence of some witnesses did not preclude the court from concluding that DCYF engaged in active efforts.

*Active Efforts to Support Sibling Relationships*

K.T. asserts that DCYF failed to undertake active efforts to support A.T.'s sibling relationships. Tailored active efforts "may include" "[t]aking steps to keep siblings together whenever possible." *G.J.A.*, 197 Wn.2d at 889 (quoting 25 C.F.R. § 23.2(6)). DCYF neglects to respond directly to this argument, though it argues, without citing the record, that it "encouraged sibling contact when possible." K.T. does not adequately establish that tailored active efforts required additional efforts to keep siblings together in

25

this case. K.T. acknowledges that A.T.'s contact with siblings was associated with her placement in Arizona. K.T. argues, "Moving A.T. to an out-of-state placement hindered A.T.'s ability to interact and grow to know her siblings. If R.M. was the only relative placement option, then maybe placing A.T. there was a reasonable trade-off." To the extent DCYF means to argue that it encouraged sibling contact when possible through its efforts to maintain visitation locally in Washington when A.T. was in Arizona, the evidence is supportive that DCYF made active efforts under the circumstances of A.T.'s placement in Arizona. Although not speaking directly to sibling relationships, the Colville Tribe's Qualified Expert Witness testified that R.M. "used to live here, and her children are all members of the Colville Tribe and her grandchildren, and she comes up here regularly and has ties to the reservation." Further, R.M. "has family in Arizona that she keeps the child connected to," so "the child does have relationship and understanding of her family." Standing alone, K.T.'s argument on sibling relationships would fail to show a basis for appellate relief. But given our reversal on the issue DCYF's relative search and the impact of A.T.'s placement on her sibling relationships, we decline to reach the question whether DCYF made any required active efforts toward maintaining sibling relationships.

## CONCLUSION

Because the evidence fails to show that DCYF made active efforts to search for A.T.'s extended family members, we reverse the termination order. Because that inquiry

26

logically affects the evaluation of A.T.'s placement with R.M. in Arizona, and that logically affects the evaluation of A.T.'s sibling relationships, we do not decide whether DCYF made active efforts toward maintaining sibling relationships, or whether DCYF was required to make any efforts in that regard that it did not make. We otherwise reject K.T.'s appellate arguments regarding investigation of potential cognitive limitations, addressing K.T.'s relationship with R.M., supporting K.T. in continuing mental health treatment, and the selection of trial witnesses. In further proceedings, these arguments are foreclosed unless the trial court concludes that new, material evidence supports a new, different analysis not considered by this court. Nevertheless, because DCYF did not fully show active efforts at trial, the case must be returned to dependency and the trial court must hold a new trial on termination, where DCYF must meet its burden of proof on the record at that time.

Reversed and remanded.

_____
Birk, J.

WE CONCUR:

_____                    _____
Staab, J.                                          Lawrence-Berrey, C.J.

27